UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| V. | : | No. 3:19-cr-64-1 (VLB) |
| | : | |
| ANTHONY WHYTE | : | |
| Defendant. | : | April 14, 2020 |
| | : | |

<u>**Ruling and Order Denying Defendant's Motion to Suppress [Dkt. 1018]**</u>

Before the Court is a Motion to Suppress filed by Defendant Anthony Whyte. [Dkts. 1018 (Mot.), 1018-1 (Mem. Supp. Mot.)]. Mr. Whyte moves under Federal Rule of Criminal Procedure 12 to suppress any evidence found during a warrantless search on February 21, 2019 of Unit #10 ("Unit #10) in his apartment complex. He also moves for a *Franks* hearing to explore missing facts in the affidavit supporting the search warrant for the large safe found in Unit #10. The Government opposes his motion. [Dkt. 1034]. For the reasons given below, the Court denies the motion.

I. <u>Relevant Background</u>

A. *<u>Mr. Whyte and Unit #10</u>*

Starting in 2017 until the time of the search, Anthony Whyte was a tenant at Unit #14 of the relevant apartment complex, and he resided there. [Dkt. 1018-3 (3/11/2020 Whyte Aff.) at ¶ 2]. Amy Sarcia managed the complex. [Dkt. 1034-2 (Search Warrant: Feb. 21, 2019 Penagos Aff.) at ¶ 16]. There were numerous phone calls between them. [Dkt. 1-1 (Feb. 19, 2019 Lawrie Master Aff.) at ¶¶ 236-246].

Mr. Whyte was a tenant under written lease for Unit # 14 and paid $975.00 per month. [Dkt. 1018-3 at ¶3]. In January of 2019, he spoke with Amy Sarcia about

leasing Unit #10, though at the time there was a tenant living there. *Id.* at 6. He paid Ms. Sarcia $375, or half of the first month's rent for the apartment. *Id.* at ¶7. Mr. Whyte and Ms. Sarcia both had access to Unit # 10. *Id.* at ¶7. He obtained a key for Unit # 10 from Ms. Sarcia. *Id.* at ¶9.

He never paid utilities nor was he billed for utilities for Unit # 10. *Id.* at ¶ 10. Mr. Whyte states that he never physically moved in to Unit #10, and he never put any of his possessions, clothes, personal items, or a large safe in Unit #10. *Id.* at ¶8. He states that the items found in Unit #10 were not his. *Id.* at ¶¶ 10, 13.

### B. The Searches

On February 21, 2019, Anthony Whyte and twelve other individuals, including Amy Sarcia, were arrested pursuant to criminal complaints. [Dkt. 1]. At the time of her arrest, Ms. Sarcia gave a post-Miranda statement in which she stated the following:

> There was an empty apartment in her apartment building, identified by Sarcia as unit number 10, to which she and Whyte have access. Sarcia explained that Whyte intended to move his items into unit number 10 the next month but had not fully moved into the unit at that time. The unit does not currently have any utilities. Sarcia provided written consent to enter the location she identified as unit number 10.

[Dkt. 1034-2 (Search Warrant: Feb. 21, 2019 Penagos Aff.) at ¶ 17]; *see* [Dkt. 1018-3 at ¶ 16]. In the interview, Sarcia also stated that she "occasionally used Apartment 10 to shower and change clothes, instead of driving home," and that she "had clothes in the apartment." [Dkt. 1034-1 (Mar. 12, 2019 Devanney Report) at ¶4.].

Immediately after the interview of Ms. Sarcia, an agent asked Mr. Whyte, who was also detained, for the key to Unit # 10. *Id.* at ¶ 4. At the time, he denied having

a key and stated that he did not have access to that unit. *Id.* He declined to make other statements. [Dkt. 1034-2 at ¶ 17].

"In the initial search of Unit # 10, agents found a small amount of suspect cocaine base and evidence of narcotics packing and distribution such as baggies, cutting agent, and five digital scales," as well a large safe. [Dkt. 1034-2 at ¶19]. "Two narcotics detective canines… alerted to the presence of narcotics within [the large safe]. Both of the detection canines have been trained to detect controlled substances and are up-to-date on their certifications." *Id.* "Sarcia denies any knowledge" of the safe. *Id.*

On the basis of the information stated, as well as other information in the search warrant application affidavit, and the information in the Master Affidavit, [Dkt. 1-1], the Court (Spector, M.J.) granted the application for a search warrant of the safe. [Dkt. 1034-2 at 1-2].

Mr. Whyte believes that agents opened the safe found in Unit #10 prior to obtaining a search warrant for the same. [Dkt. 1018-3 at ¶3]. He did not consent to a search of Unit # 10 or the safe. *Id.* at ¶ 16

### C. Indictment

On March 5, 2019, a federal grand jury returned an indictment against twenty-four defendants, including Mr. Whyte. [Dkt. 29]. The indictment charged Mr. Whyte with conspiracy to distribute narcotics, as well as additional narcotics and firearms violations. *Id.* The Government also charges that Ms. Sarcia laundered narcotics proceeds for Mr. Whyte through her business and provision of multiple units. *Id.* at ¶¶ 31-33. On August 9, 2019, a federal grand jury returned a superseding indictment

against twenty defendants, including Mr. Whyte. [Dkt. 442]. The charges against Mr. Whyte are the same. *Id.*

II.     Motion to Suppress Evidence Found in Unit # 10

A. *Legal Standard*

The law governing warrantless searches and the admissibility of evidence seized during such searched is undisputed. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

The defendant must show that he had a legitimate expectation of privacy in the place searched and items seized. *See United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). Warrantless searches are presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). If the defendant succeeds in showing that the officers conducted a warrantless search, the burden shifts to the Government to show that the search fell within one of the exceptions to the warrant requirement. *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (exceptions are "specifically established and well-delineated").

A defendant bears the initial burden of proof on a motion to suppress, but where the "defendant establishes some factual basis for the motion, the burden of proof shifts to the Government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005); *United States v. O'Neill*, No. 15-CR-151W, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (same). Ultimately, the party carrying the burden must do so by a preponderance of the evidence. *O'Neill*, 2016 WL 6802644, at *8.

B. *Analysis*

Here, the parties agree that the Government did not obtain a warrant and that Mr. Whyte had an expectation of privacy in Unit #10. The Government argues that the search was a valid consent search.

1. *Standing*

Only defendants whose Fourth Amendment rights have been violated – that is, who have a "legitimate expectation of privacy," may bring motions to suppress. *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12 (1978). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* at n. 12. The Court finds that Mr. Whyte had a legitimate expectation of privacy in Unit #10 because the unit was not a public space (that is, it had a door with a lock), he had paid half of a month's rent, and he had received a key to the space.

2. *Consent Search*

> [T]he Fourth Amendment does not forbid a warrantless search of private property pursuant to consent, voluntarily given, by the owner of the property, or by 'another person who has authority to consent by reason of that person's 'common authority over or other sufficient relationship to the premises,' or by a person who in fact lacked authority to consent but who 'reasonably appeared to the police to possess authority to consent to the search.'

*United States v. Ojudun*, 915 F.3d 875, 883 (2d Cir. 2019) (quoting *United States v. McGee*, 564 F.3d 136, 138 (2d Cir. 2009)). The Court finds that Ms. Ferry had both actual and apparent authority to consent to the search of Unit # 10.

   i. **Actual Authority**

"Common authority" "rests… on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974). Even if a person has authority to consent to a search of a shared space, she may not have authority to consent to "all areas or containers" in that space. *United States v. Buettner-Janusch*, 646 F.2d 759, 766 (2d Cir. 1981) *cert. denied,* 454 U.S. 830 (1981). "If a specific area is in fact surrounded by an independent privacy interest, a government agent must either obtain a warrant to search it or is required to bring his examination within one of the exceptions to the warrant requirement." *Id.*

"In general, a landlord does not have common authority over an apartment or other dwelling unit leased to a tenant." *United States v. Elliott*, 50 F.3d 180, 186 (2d Cir. 1995); *see Chapman v. United States*, 365 U.S. 610 (1961). "A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased." *Id.* And, where no rent is paid, no mention made of a landlord-tenant relationship, and there is no evidence that a location is occupied for any other purpose than that of the conspiracy, the proper lens is not that of a landlord-tenant relationship. *See United States v. Wixom*, 441 F.2d 623, 625 (7th Cir. 1971) (finding valid consent by owner although there was evidence of an oral lease where there was no evidence that the house was occupied for any purpose other than counterfeiting operation, no rent was paid, owner did not mention landlord-

tenant relationship to officers, and owner was participant in counterfeiting scheme and often went to residence to observe,).

Here, the parties agree Mr. Whyte and Ms. Sarcia had access to Unit #10. [Dkt. 1018-3 at ¶ 7-8]. Mr. Whyte does not contest that Ms. Sarcia had clothes in the apartment, nor does he contest that Ms. Sarcia told interviewing agents that she kept clothes in the apartment and that she "occasionally used Apartment 10 to shower and change clothes, instead of driving home." [Dkt. 1034-1 (Mar. 12, 2019 Devanney Report) at ¶4.]. The fact that she showered in the space demonstrates that Ms. Sarcia was confident of her control over it, as does the fact that she stored her possessions there. On the basis of these undisputed facts, the Court finds that Ms. Sarcia had joint access to and control of the space for most purposes, such that she had common authority to consent to a search.

At one point in his memorandum of law, Mr. Whyte seems to argue that the proper lens of analysis is the landlord-tenant relationship, arguing that "the apartment was leased to Whyte," referring himself to a "tenant," and stating "there is no written lease that might have granted the landlord consent to enter or to grant that consent to others." [Dkt. 1018-1 at 6]. But while Mr. Whyte declares in his affidavit that he gave Ms. Sarcia half a month's rent and had a key to Unit #10, he does not state in his affidavit that he had leased Unit #10, that he ever paid a full month's rent, or what the term of any lease would have been. [Dkt. 1018-3 at 3].[1] He

---

[1] In contrast, he does state that he had a written lease for Unit #14. *Id.* His memorandum of law suggests that he did not have a written lease for Unit #10: "There is no written lease that might have granted the landlord consent to enter or grant that consent to others." [Dkt. 1018-1 at 6].

states he "never physically moved in" to Unit #10, he "never put any of [his] possessions" there, he "never paid utilities nor was [he] ever billed for them" for the unit, and that none of the "items identified in that Unit" were his. *Id.* at ¶¶7-13. Here, where Mr. Whyte had not moved in to Unit # 10, paid no more than half a month's rent, and Ms. Sarcia had extensive access to the apartment as detailed above, the Court finds Ms. Sarcia was not simply a landlord or apartment manager, but instead someone with much wider access and control. *See Wixom*, 441 F.2d at 625.

   ii.     **Apparent Authority**

If a person does not in fact have authority to consent, a warrantless search is still valid when, by "an objective standard: … the facts available to the officer at the moment ... 'warrant a [person] of reasonable caution in the belief' " that the consenting party had authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). In *United States v. Elliott*, 50 F.3d 180 (2d Cir. 1995), the Second Circuit found that police officers' belief that a landlord had authority to consent to a search of a bedroom was reasonable where the landlord claimed the bedroom was unleased and had previously authorized the officers to enter vacant bedrooms in the same building. *Id.* at 187.

Here, at the time prior to the search, Ms. Sarcia told law enforcement "that there was an empty apartment in her apartment building, identified by Sarcia as unit number 10, to which she and Whyte have access. Sarcia explained that Whyte intended to move his items into unit number 10 the next month but had not fully moved into the unit at that time. The unit does not currently have any utilities.

Sarcia provided written consent to enter the location she identified as unit number 10." [Dkt. 1034-2 at ¶ 17]. In the interview, Sarcia also stated that she "occasionally used Apartment 10 to shower and change clothes, instead of driving home," and that she "had clothes in the apartment." [Dkt. 1034-1 (Mar. 12, 2019 Devanney Report) at ¶4.]. Immediately after the interview of Ms. Sarcia, an agent asked Mr. Whyte, who was also detained, for the key to Unit # 10. *Id.* at ¶ 4. At the time, he denied having a key and stated that he did not have access to that unit, though officers found a key for the unit in his possession *Id.*

In addition to Ms. Sarcia's actual authority discussed above, the Court also finds that the facts available to law enforcement at the moment would warrant a person of reasonable caution in the believe that Ms. Sarcia had authority over Unit # 10. Ms. Sarcia stated that she had access to Unit #10, including as a space to shower and store clothes; that Mr. Whyte intended to, but had not fully moved into the unit; and Mr. Whyte denied having access to the apartment. For these reasons, the Court also finds that Ms. Sarcia had apparent authority over the apartment.

### iii. Consent

If two residents are physically present during the search of their dwelling, and one expressly denies consent to search, the other's consent is not valid. *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006). If the objecting party is absent when another person validly consents, the objection does not undermine the consent. *Fernandez v. California*, 571 U.S. 292, 294 (2014). A person's consent may be valid even if the defendant is present and the police do not ask the defendant for consent. *United States v. Matlock*, 415 U.S. 164(1974).

Mr. Whyte does not contest that Ms. Sarcia voluntarily consented to the search of the apartment. Mr. Whyte does not contend that he objected to the search of the apartment, only stating that he did not "consent" to its search. *See* [Dkt. 1018-2 at ¶ 16]. Therefore, Whyte does not raise an issue of fact as to whether there was an objection to the search. Given its findings above regarding Ms. Sarcia's authority to consent, the Court finds that the undisputed facts establish that the consent search was valid. *See Matlock*, 415 U.S. 164

Since the affidavit and other evidence Mr. Whyte submitted do not "create a dispute over any material fact" going to validity, the Court does not hold a hearing before denying Mr. Whyte's motion to suppress. *United States v. Caming*, 968 F.2d 232, 236 (2d Cir. 1992); *see United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)

III.     Motion for *Franks* Hearing as to Large Safe found in Unit #10

A. *Standing*

Mr. Whyte states in his affidavit that "the large gun safe and its contents in Unit #10 were not mine." [Dkt. 1018-3 at ¶ 10]. Taken at face value, the statement establishes that Mr. Whyte does not have standing to move for a *Franks* hearing as to the large safe. *See Rakas,* 439 U.S. at 143 & n.12. However, the Court goes on to the merits.

B. *Legal Standard*

The search of the large safe found in Unit #10 was pursuant to a search warrant. [Dkt. 1034-2 at 1-2]. "A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236. (1983). A *Franks* hearing is required if – and only if – "the defendant makes a

substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and… the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56, 171-72 (1978); *see United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (finding no hearing required because, even after correcting affidavit for erroneous statement, remaining facts supported probable cause).

C. *Discussion*

Mr. Whyte argues for a *Franks* hearing on two grounds: that the warrant affiant failed to include any details of any effort to seek consent from Whyte to search either Unit #10 or the gun safe, and that the warrant affiant mispresented Ms. Sarcia's ability to consent to the search of Unit # 10. [Dkt. 1018-1 at 3-5]. As to the second point, Mr. Whyte argues that he would be the only person entitled to assert a privacy interest in Unit #10, and that the affidavit fails to state that Mr. Whyte had leased the apartment,[2] incorrectly states that Ms. Sarcia is an owner/operator instead of a manager, and does not elaborate on the joint access that she and Mr. Whyte shared to Unit # 10. [Dkt 1018-1 at 5-7].

The warrant affidavit states, in relevant part, as follows:

> At the time of her arrest, Sarcia gave a post-Miranda statement in which she stated that there was an empty apartment in her apartment building, identified by Sarcia as unit number 10, to which she and Whyte have access. Sarcia explained that Whyte intended to move his items into unit number 10 the next month but had not fully moved into the unit at that time. The unit does not currently have any utilities. Sarcia provided written consent to enter the location she identified as

---

[2] As discussed above, Mr. Whyte does not declare in his affidavit that he leased Unit #10. *See* [Dkt. 1018-3].

> unit number 10. At the time Sarcia gave consent, Mr. Whyte was in another unit in the apartment complex, had been placed under arrest, and had informed officers that he declined to make any statements.

[Dkt. 1034-2 (Search Warrant: Feb. 21, 2019 Penagos Aff.) at ¶ 17]. The warrant affidavit further states that Ms. Sarcia "owns/operates an apartment building in which Anthony Whyte resides and distributes/stores narcotics." *Id.* at ¶16. The warrant affidavit also states that "Sarcia denied any knowledge" of the gun safe, thereby informing the Magistrate Judge that she did not claim to be able to consent to a search of the safe. *Id.* at ¶19.

The Court finds that the search warrant contained additional information sufficient to independently show probable cause, so that the statements concerning Ms. Sarcia's consent or Mr. Whyte's connection to the apartment were not essential to the probable cause determination. The Court has already considered and found that the search of Unit # 10 was valid. Within Unit # 10, officers located "a small amount of suspect cocaine base and evidence of narcotics packing and distribution such as baggies, cutting agent, and five digital scales." *Id.* at ¶19. Further, the affidavit states that "two narcotics detective canines have alerted to the presence of narcotics within [the large safe]. Both of the detection canines have been trained to detect controlled substances and are up-to-date on their certifications." *Id.* These statements are sufficient in themselves to establish probable cause, and so are an independent reason to deny Mr. Whyte's motion for a *Franks* hearing.

As to Mr. Whyte's first point, the Court finds that the warrant affidavit accurately stated that Mr. Whyte "declined to make any statements," and did not

misrepresent that Mr. Whyte had given consent to search. As to his second point, the Court has found that Ms. Sarcia had the ability to consent to search, and so the possible falsity of any individual statement is immaterial. *See* Section II, *supra*.

IV. <u>Contested Facts</u>

Mr. Whyte does gesture towards contesting two facts.

First, in his memorandum of law, he contests where the key to Unit #10 was found: he claims that, contrary to the Government's search warrant affidavit, the key was placed in his apartment after a search and came from elsewhere, possibly Mr. Whyte's keychain or his personal possession. [Dkt. 1018-1 at 5]. His affidavit only states he had "obtained a key for Unit #10 from Amy Sarcia," *see* [Dkt. 1018-3] however, and so is insufficient to create a dispute of fact about its location, let alone one that goes to a material issue.

Second, Mr. Whyte states that "he believes that agents opened the gun safe prior to obtaining a search warrant for the same." [Dkt. 1018-3 at ¶15]. He does not state the basis for that belief, nor how he could make the statement from personal knowledge when he was not in Unit # 10 at the time the safe was opened. Mr. Whyte's unfounded conjecture alone is insufficient to create a dispute of fact.

V. <u>Conclusion and Order</u>

For the reasons given, the Court DENIES Mr. Whyte's motion to suppress.

It is so ordered.

_____/s/_____

**Honorable Vanessa L. Bryant**

**District of Connecticut**

**Dated at Hartford, Connecticut: April 14, 2020**