**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　*Plaintiff*,<br><br>　　　　v.<br><br>ANTHONY WHYTE,<br>AMY SARCIA,<br>　　　*Defendants*. | No. 3:19-cr-00064 (VAB) |

**RULING AND ORDER ON POST-TRIAL MOTIONS**

After an eleven-day trial, a jury found Anthony Whyte guilty of conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl under 21 U.S.C. § 841(a)(1) (Count One); possession with intent to distribute and distribution of heroin under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Two and Three); possession with intent to distribute and distribution of 100 grams or more of heroin, 500 grams or more cocaine, and 40 grams or more of fentanyl under 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), 841(b)(1)(B)(ii), and 841(b)(1)(B)(vi) (Count Eight); possession of firearms in furtherance of a drug trafficking crime under 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2) (Count Nine); and conspiracy to launder monetary instruments under 18 U.S.C. § 1956(a)(1)(A)(i) (Count Thirteen).

The jury also found Amy Sarcia guilty of conspiracy to possess with intent to distribute and to distribute cocaine and/or heroin, more specifically 500 or more grams of cocaine and 100 grams or more of heroin under 21 U.S.C. § 841(a)(1) (Count One) and conspiracy to launder monetary instruments under 18 U.S.C. § 1956(a)(1)(A)(i) (Count Thirteen). Jury Verdict, ECF

1

No. 1790 (Sept. 28, 2021) ("Jury Verdict"); Second Superseding Indictment, ECF No. 704 (Oct. 23, 2019) ("Second Superseding Indictment").

Before the jury issued its verdict, both Mr. Whyte and Ms. Sarcia moved for acquittal, and both defendants renewed these motions after the jury issued its verdict. Mr. Whyte moves for judgment of acquittal as to Counts Nine and Thirteen. Oral Mot. for J. of Acquittal as to [C]ounts 9 and 13 by Anthony Whyte, ECF No. 1770 (Sept. 23, 2021); Renewed Oral Mot. for Acquittal by Anthony Whyte, ECF No. 1785 (Sept. 28, 2021); Def. Anthony Whyte's Mem. in Supp. Mot. for J. of Acquittal Pursuant to F. R. Crim. P. 29, ECF No. 1806 (Oct. 15, 2021) ("Whyte Mem. for J. of Acquittal"). He also moves for acquittal as to Counts One, Two, Three, and Eight, Suppl. Mem. in Supp. of Mot. for Acquittal Pursuant to F. R. Crim. P. 29, ECF No. 1914 (Feb. 15, 2022) ("Whyte First Suppl. Mem. for J. of Acquittal"), and for acquittal on the basis of having never entered a plea to the Second Superseding Indictment, Second Supplement to Mem. in Supp. of Mot. for Acquittal Pursuant to Fed. R. Crim. P. 29, ECF No. 1930 (Apr. 11, 2022) ("Whyte Second Suppl. Mem. for J. of Acquittal").

Ms. Sarcia moves for acquittal as to the two counts of which she was found guilty, Counts One and Thirteen. Oral Mot. for J. of Acquittal by Amy Sarcia, ECF No. 1771 (Sept. 23, 2021); Renewed Oral Mot. for Acquittal by Amy Sarcia, ECF No. 1786 (Sept. 28, 2021); Mem. of Law in Supp. of Defendant Amy Sarcia's Rule 29 Mot. for J. of Acquittal, ECF No. 1799 (Oct. 8, 2021) ("Sarcia Mem. for J. of Acquittal").

Mr. Whyte has also moved for a new trial based on prosecutorial misconduct. Defendant Anthony Whyte's Rule 33 Mot. for a New Trial Due to Government Misconduct, ECF No. 1967 (Aug. 10, 2022) ("Whyte Mot. for New Trial").[1]

---

[1] The Court will resolve this motion once all briefing has been completed.

For the following reasons, the Court **DENIES** Mr. Whyte's motion for judgement of acquittal.

As to Ms. Sarcia, the Court **GRANTS** in part and **DENIES** in part Ms. Sarcia's motion for judgment of acquittal.

Ms. Sarcia's motion for acquittal is **GRANTED** as to **COUNT ONE**, but **DENIED** as to **COUNT THIRTEEN.**

Consistent with Rules 29 and 31(c) of the Federal Rules of Criminal Procedure, however, the Court will enter a judgment of conviction as to Ms. Sarcia on the lesser included offense of a conspiracy without any specific quantity of cocaine or heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Also, consistent with Rule 29(d), the Court conditionally grants Ms. Sarcia a new trial on Count One, in the event the Second Circuit Court of Appeals vacates or reverses this Rule 29 ruling.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    A.      **Pre-Trial Case History**

This case arose from a joint investigation between the New London Police Department ("NLPD") and the Drug Enforcement Administration ("DEA") into a suspected drug trafficking ring based out of Connecticut. Master Aff. ¶¶ 1, 11–18, ECF No. 1-1 (Feb. 19, 2019). DEA agents intercepted wire and electronic communications involving the targets of the investigation under Title III warrants approved by U.S. District Court Judge Michael P. Shea.[2] *Id.* ¶ 19. The multi-month investigation revealed that the targets were involved in the commission of the suspected offenses. *Id.* ¶¶ 19–20.

---

[2] Title III refers to Title III of the Omnibus Crime Control of Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22, as amended by the Electronic Communications Privacy Act, commonly known as the Wiretap Act.

Specifically, Mr. Whyte was suspected of using various sources to obtain and transport cocaine, heroin, and fentanyl to Connecticut and of working with others to distribute narcotics in the state. *Id.* ¶ 22. Ms. Sarcia was suspected of utilizing her food business, Two Wives Pizza ("Two Wives"), to launder Mr. Whyte's narcotics proceeds and also of distributing narcotics for him. *Id.* ¶ 195.

On February 21, 2019, law enforcement officials arrested Mr. Whyte, Ms. Sarcia, and other individuals targeted in the investigation. Ms. Sarcia was released that same day. Order Setting Conditions of Release, ECF No. 11 (Feb. 21, 2019).

A grand jury subsequently returned three indictments. A total of twenty-six defendants were charged as part of the narcotics conspiracy. Second Superseding Indictment, ECF No. 704 (Oct. 23, 2019).

On March 5, 2019, the grand jury returned its first indictment, charging Mr. Whyte with conspiracy to distribute, and to possess with intent to distribute, from approximately March 2018 through on or about February 21, 2019, 100 grams or more of heroin, a detectable amount of fentanyl, and five kilograms of cocaine (Count One); possession with intent to distribute and distribution of heroin on or about October 15, 2018, October 30, 2018, and December 12, 2018 (Count Ten, Count Eleven, Count Twelve); possession with intent to distribute 500 grams or more of cocaine and 100 grams or more of heroin on or about February 21, 2019 (Count Seventeen); possession of firearms in furtherance of a drug trafficking crime (Count Eighteen); conspiracy to launder monetary instruments from approximately April 2017 through February 21, 2019 (Count Twenty-Two). The first indictment also charged Ms. Sarcia with conspiracy to distribute, and to possess with intent to distribute, 100 grams or more of heroin and 500 grams or more of cocaine (Count One); and conspiracy to launder monetary instruments from

4

approximately April 2017 through February 21, 2019 (Count Twenty-Two). Indictment, ECF No. 29 (Mar. 5, 2019).

On March 13, 2019, Mr. Whyte appeared before Magistrate Judge Sarah Merriam for an arraignment proceeding. Min. Entry, ECF No. 161 (Mar. 13, 2019).

On August 6, 2019, the grand jury returned a Superseding Indictment. Superseding Indictment, ECF No. 426 (Aug. 6, 2019). The relevant charges remained unchanged, except that the Counts were reordered, and so the charges were listed as different count numbers than in the original indictment.

On October 4, 2019, Mr. Whyte appeared before Magistrate Judge Robert A. Richardson for an arraignment. Min. Entry, ECF No. 640 (Oct. 4, 2019).

On October 23, 2019, the grand jury returned a Second Superseding Indictment. Second Superseding Indictment, ECF No. 704 (Oct. 23, 2019). The Second Superseding Indictment charged Mr. Whyte with conspiracy to distribute, and to possess with intent to distribute, from approximately March 2018 through on or about February 21, 2019, 100 grams or more of heroin, 40 grams or more of fentanyl, and five kilograms or more of cocaine (Count One); possession with intent to distribute and distribution of heroin on or about October 15, 2018, October 30, 2018, and December 12, 2018 (Count Two, Count Three, Count Four); possession with intent to distribute 500 grams or more of cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl on or about February 21, 2019 (Count Eight); possession of firearms in furtherance of a drug trafficking crime (Count Nine); conspiracy to launder monetary instruments from approximately April 2017 through February 21, 2019 (Count Thirteen). Ms. Sarcia's charges (Count One and Count Thirteen) remained unchanged.

On October 25, 2019, Magistrate Judge Robert A. Richardson issued an order stating,

ORDER as to Anthony Whyte, Royshawn Allgood, Holly Butler, Kemar Cameron, Niren Davis, Earlene Dudley, Jr, Victor Encarnacion, Joshua Feldman, Antoine Forbes, Ramel General, Benjamin Gregor, Jackie Hernandez, Juan Hernandez, Ronald Ketter, Orlayn Marquez, Bryon McClellan, Aggray McLeod, Princetafari Vidal, Emilio Rodriguez, Amy Sarcia, Jeremy Sanborn, Dilma Solange Silva, Sasha Swain, Rayquan Stokely, Geoffrey Gordon, Robert Winston: If the defendants wishes to waive an in-person appearance pursuant to Rule 10(b) and have the arraignment marked OFF, defendant may file a written waiver on the docket. Any such waiver must be signed by both counsel and the defendant. Any Rule 10(b) waiver must state that: (1) the defendant pleads not guilty to each count charged in the Superseding Indictment; (2) the defendant has received a copy of the Superseding Indictment; (3) the defendant understands the nature and substance of all charges and the minimum and maximum penalties; (4) the defendant has reviewed the Superseding Indictment with counsel, by phone or in person; and (5) the defendant understands the right to appear in person before the Court for an arraignment but chooses to waive that right. It is so ordered,
Signed by Judge Robert A. Richardson on 10/25/19. (Blue, A.) (Entered: 10/25/2019)

Order, ECF No. 713 (Oct. 25, 2019).

On November 5, 2019, Ms. Sarcia filed a waiver of Rule 10(b) Hearings. Def. Amy Sarcia's Waiver of Appearance, ECF No. 740 (Nov. 5, 2019). Mr. Whyte did not file a written waiver.

On April 22, 2020, Mr. Whyte and Ms. Sarcia's cases were transferred to this Court. Order of Transfer, ECF No. 1094 (Apr. 22, 2020).

On March 17, 2021, Magistrate Judge Sarah A. L. Merriam held a *Frye* hearing to discuss with Mr. Whyte his understanding of the plea offer extended by the Government as to charges in the Second Superseding Indictment.[3] Min. Entry, ECF No. 1536 (Mar. 17, 2021); Transcript, ECF No. 1932 (Apr. 18, 2022) (Transcript of March 17, 2021, *Frye* hearing) ("Frye Hearing Tr.").

---

[3] In *Missouri v. Frye*, the Supreme Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." 566 U.S. 134, 145 (2012). A *Frye* hearing is held to evaluate the Government's plea offer and the potential penalties that the defendant faces if convicted at trial. *See also United States v. Albarran*, 943 F.3d 106, 113 n.5 (2d Cir. 2019) ("In a *Frye* hearing, the court strives to ensure that a full and accurate communication on the subject has occurred.").

On May 12, 2021, the parties filed a Joint Trial Memorandum. Trial Mem., ECF No. 1593 (May 12, 2021).

On August 6, 2021, the Government filed its proposed jury instructions. Proposed Jury Instructions, ECF No. 1692 (Aug. 6, 2021).

On August 20, 2021, Mr. Whyte filed his proposed jury instructions. Proposed Jury Instructions, ECF No. 1708 (Aug. 20, 2021).

On September 12, 2021, the Court filed proposed annotated post-trial jury instructions. Proposed Annotated Post-Trial Jury Instructions, ECF No. 1749 (Sept. 12, 2021).

On September 24, 2021, the Court held a charge conference to discuss the proposed post-trial jury instructions. Min. Entry, ECF No. 1778 (Sept. 24, 2021).

On September 26, 2021, the Court filed the final version of the post-trial jury instructions. Jury Instructions, ECF No. 1776 (Sept. 26, 2021) ("Jury Instructions").

### B.      Trial Proceedings

Jury selection began on September 8, 2021, and the trial commenced on September 10, 2021. Min Entry, ECF No. 1747 (Sept. 8, 2021); Min. Entry, ECF No. 1753 (Sept. 10, 2021).

On September 23, 2021, after the close of the Government's case in chief, both Mr. Whyte and Ms. Sarcia orally moved for judgment of acquittal. Oral Mot. for J. of Acquittal by Amy Sarcia, ECF No. 1771 (Sept. 23, 2021); Oral Mot. for J. of Acquittal as to [C]ounts 9 and 13 by Anthony Whyte, ECF No. 1770 (Sept. 23, 2021).

On September 28, 2021, after nine days of trial, the jury returned a verdict of guilty on all counts against both Mr. Whyte and Ms. Sarcia. Jury Verdict.

As to Count One, the jury found Mr. Whyte liable for 5 kilograms or more of cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl. Jury Verdict at 1–2. The jury did

not find Mr. Whyte liable for a specific quantity of drugs as to Counts Two and Three, which
charged him with possession with intent to distribute and distribution of heroin on October 15,
2018, and October 30, 2018. *Id.* at 2–3. As to Count Eight, the jury found Mr. Whyte liable for
500 grams or more of cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl.
*Id.* at 3–4. The jury found Mr. Whyte guilty of Count Nine, which charged possession of a
firearm in furtherance of a drug trafficking crime. *Id.* at 4. It also found him guilty of Count
Thirteen, charging conspiracy to commit money laundering, and found that he conspired to
commit money laundering with the intent of promoting the carrying on of a specified unlawful
activity and that he did so knowing the transactions were designed in whole or in part to conceal
and disguise the nature, location, source, ownership, and control of the proceeds of the narcotics
trafficking. *Id.*

As to Count One, the jury found Ms. Sarcia liable for 500 grams or more of cocaine and
100 grams or more of heroin. *Id.* at 2. The jury also found Ms. Sarcia guilty of conspiracy to
commit money laundering, as charged in Count Thirteen of the Second Superseding Indictment.
*Id.* at 5. The jury found that she conspired to commit money laundering with the intent to
promote the carrying on of narcotics trafficking and that she did so knowing the transactions
were designed in whole or in part to conceal and disguise the nature, location, source, ownership,
and control of the proceeds of the narcotics trafficking. *Id.*

Also on September 28, 2021, after the jury returned its verdict, Mr. Whyte and Ms. Sarcia
renewed their oral motion for acquittal. Renewed Oral Mot. for Acquittal by Anthony Whyte,
ECF No. 1785 (Sept. 28, 2021); Renewed Oral Mot. for Acquittal by Amy Sarcia, ECF No. 1786
(Sept. 28, 2021). The Court took the motions under advisement. Min. Entry, ECF No. 1788
(Sept. 28, 2021).

###### C.   Post-Trial Motions

On October 8, 2021, Ms. Sarcia filed a memorandum in support of her motion for judgment of acquittal. Sarcia Mem. for J. of Acquittal.

On October 15, 2021, Mr. Whyte filed a memorandum in support of his motion for judgment of acquittal. Whyte Mem. for J. of Acquittal.

On October 22, 2021, the Government filed an opposition to both defendants' motions for judgment of acquittal. Government's Opp'n, ECF No. 1814 (Oct. 22, 2021) ("Gov't Opp'n").

On November 8, 2021, Ms. Sarcia filed a reply to the Government's opposition. Def. Amy Sarcia's Reply Brief to Rule 29 Mot., ECF No. 1830 (Nov. 8, 20121) ("Def. Amy Sarcia's Reply").

On November 9, 2021, Mr. Whyte filed a reply to the Government's opposition. Def. Anthony Whyte's Resp. to the Government's Opp'n to his Mot. for Acquittal, ECF No. 1831 (Nov. 9, 2021) ("Def. Anthony Whyte's Reply").

On February 15, 2022, Mr. Whyte filed an additional memorandum indicating that he "wishe[d] to supplement his arguments by expanding his motion for acquittal to also encompass the drug counts (Counts 1, 2, 3, and 8 of the Second [S]uperseding Indictment)." Whyte First Suppl. Mem. for J. of Acquittal at 2.

On February 22, 2022, the Government objected to Mr. Whyte's additional memorandum expanding his motion for acquittal. Government's Objection to Def.'s Untimely and Non-Responsive Mem., ECF No. 1916 (Feb. 22, 2022) ("Obj. to Whyte First Suppl. Mem. for J. of Acquittal").

On April 11, 2022, Mr. Whyte filed a second supplemental memorandum in support of his Rule 29 motion, in which he argues that he never entered a plea to the Second Superseding Indictment. Whyte Second Suppl. Mem. for J. of Acquittal.

On April 12, 2022, Mr. Whyte filed a revision to this second supplemental memorandum, in which he notes an additional difference between the Second Superseding Indictment and the preceding indictments. Revision to Second Suppl. to Mem. in Supp. of Mot. for Acquittal Pursuant to Fed. R. Crim. P. 29, ECF No. 1931 (Apr. 12, 2022) ("Whyte Third Suppl. Mem. for J. of Acquittal").

On April 20, 2022, the Government filed an objection to Mr. Whyte's April 11 and April 12, 2022, supplemental memoranda. Government's Obj. to Def.'s Third and Fourth Purported Suppl. Rule 29 Mems., ECF No. 1935 (Apr. 20, 2022) ("Gov't Objection to Suppl. Mems.").

On August 9, 2022, Mr. Whyte filed a Rule 33 motion for a new trial due to government misconduct. Whyte Mot. for New Trial.

On August 29, 2022, the Government filed a motion for extension of time requesting until September 14, 2022, to respond to Mr. Whyte's motion for new trial. Government's Mot. for Extension of Time to Respond to Def. Whyte's Rule 33 Mot. for a New Trial, ECF No. 1970 (Aug. 29, 2022).

On August 30, 2022, the Court granted the Government's motion for extension of time until September 14, 2022, to file a response to the motion for a new trial. Order, ECF No. 1971 (Aug. 30, 2022).

On September 9, 2022, the Court held a hearing on the outstanding post-trial motions. Min. Entry, (Sept. 9, 2022).

## II.      STANDARD OF REVIEW

When reviewing a judgment of acquittal after a jury verdict, courts must determine

"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

"A court may enter a judgment of acquittal only if the evidence that the defendant

committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt

beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)) (alteration and internal quotation

marks omitted). A defendant challenging the sufficiency of the evidence thus "bears a heavy

burden." *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks

omitted).

## III.     DISCUSSION

When challenging a jury's verdict, "a defendant challenging the sufficiency of the

evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" *United

States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v. Coplan*, 703 F.3d 46,

62 (2d Cir. 2012)). While "specious inferences are not indulged," *United States v. Lorenzo*, 534

F.3d 153, 159 (2d Cir. 2008), courts "defer to the jury's determination of the weight of the

evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences

that can be drawn from the evidence," *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006)

(internal citation and quotation marks omitted). "Not only must the evidence be viewed in the

light most favorable to the government and all permissible inferences drawn in its favor . . . but if

the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's

guilt beyond a reasonable doubt," the conviction must stand. *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) (internal citations omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (alterations omitted) (quoting *Guadagna*, 183 F.3d at 129).

### A.  The Judgment of Acquittal as to Anthony Whyte

On September 28, 2021, Mr. Whyte renewed his oral motion for acquittal. Renewed Oral Motion for Acquittal by Anthony Whyte, ECF No. 1785 (Sept. 28, 2021). He followed this oral motion with four filings styled as memoranda in support of the motion for judgment of acquittal, two supplements, and a revision to one of the supplements. Whyte Mem. for J. of Acquittal; Whyte First Suppl. Mem. for J. of Acquittal; Whyte Second Suppl. Mem. for J. of Acquittal; Whyte Third Suppl. Mem. for J. of Acquittal.

The Government argues that the two supplemental memoranda and the revision to one of the supplemental memoranda are untimely because Mr. Whyte is effectively seeking to file new Rule 29 motions months after the guilty verdict. The Court does not consider Mr. Whyte's memoranda as additional Rule 29 motions, and therefore will address the arguments outlined in these memoranda.

#### 1.  Counts One, Two, Three, and Eight

As to Counts One, Two, Three, and Eight, Mr. Whyte argues that "[t]here was no proof beyond a reasonable doubt as to the drug quantities charged and found and the government failed to rule out the possibility of other drug conspiracies relating to certain of the alleged drug transactions." Whyte First Suppl. Mem. for J. of Acquittal at 6. This is because "the government never itemized for the jury its specific claims of illegal drugs per count" and "[t]he nature of

12

the[] drug seizures indicates that more than one conspiracy existed," and therefore Mr. Whyte

"was substantially prejudiced by the variance between the indictment and the proof." *Id.* at 5

(citing *United States v. Parrilla*, No. 13-CR-360 (AJN), 2014 WL 7496319 (S.D.N.Y. Dec. 23,

2014)). The Court, Mr. Whyte argues, should therefore set aside the jury's finding as to drug

quantity. *Id.* at 6 (citing *United States v. Camara*, 196 F. App'x 48 (2d Cir. 2006); *United States*

*v. Jackson*, 335 F.3d 170 (2d Cir. 2003)).

In support of his argument, Mr. Whyte notes that he "was never seen or found with any

drugs in his possession," and that no drugs were actually identified from the various drug

transactions identified at trial. *Id.* at 2. These transactions include: (1) hand-to-hand sales with

confidential informant Johnny Harris; (2) a November 28, 2018, drug transaction in the parking

lot of Two Wives; (3) a November 16, 2019, drug transaction in Queens, New York, between

Mr. Whyte and Geoffrey Gordon; (4) a December 23, 2018, drug transaction in Graham,

Connecticut, between Mr. Whyte and Mr. Gordon; (5) a December 10, 2019, transaction and

chase of a Dodge Durango driven by Ramel General; and (6) a January 16, 2019, surveillance of

a car being driven to New York. *Id.* at 3–5. He also argues that several other pieces of evidence

could not be used as a basis for quantity: (1) Dilma Silva's trip to Panama to pick up cocaine,

because "[w]hether or not that smuggling operation was part of the charged conspiracy or was

based upon some other conspiracy was not ruled out," *id.* at 3; (2) Ms. Silva testifying to selling

drugs for Mr. Whyte in December 2018 but "never testif[ying] as to drug quantities", *id.*; (3)

Orlayn Marquez, who had money confiscated from him that "w[as] attributed to Anthony

Whyte[] without proof that those sums were part of the conspiracy charged," *id.*; (4) Mr.

Marquez sold cocaine twice to Mr. Whyte and fentanyl seven or eight times, but "[e]xact

quantities were never proven," *id.*; and (5) cocaine, fentanyl, and heroin were found in Unit 10 at

13 Washington Street, but "[t]here was no evidence how long these drugs had been in the safe or who put them there" and "[i]t is possible that the[y] were representative of a different conspiracy," *id.* at 4.

He further notes that "[t]he notebooks and 'numbers' seized at 3 Gregory Road in Norwich . . . did not have drug quantities or cash amounts" and that the $15,550.00 "seized from that house . . . likely belonged to its occupant." *Id.* at 5.

Finally, Mr. Whyte argues that Exhibit #1813, a note from the jury asking "[w]hat exhibits have drug quantities" demonstrates that "the issue of drug quantity was not proven beyond a reasonable doubt." *Id.* at 6.

In response, the Government argues that Mr. Whyte's challenge to the guilty verdicts as to Counts One, Two, Three, and Eight are not supported by the record for several reasons.

First, the Government notes that Counts Two, Three, and Eight are not conspiracy counts but rather "substantive narcotics charges." Obj. to Whyte First Suppl. Mem. for J. of Acquittal at 3.

Second, Counts Two and Three pertained to an unspecified quantity of heroin. *Id.*

Third, as to Count Eight, which did allege particular quantities, the evidence presented "regarding the narcotics within the stash apartments as well [as] evidence of [Mr.] Whyte's possessory interest in these locations was more than enough to support the jury's findings" as to the quantities listed in Count Eight. *Id.* at 3 (citing Gov. Ex. 382, Gov. Ex. 374, Gov. Ex. 372, Gov. Ex. 380, Gov. Ex. 378, Gov. Ex. 248, Gov. Ex. 252, Gov. Ex. 246, Gov. Ex. 250, Gov. Ex. 110, Gov. Ex. 134, Gov. Ex. 150, Gov. Ex. 151).

Fourth, as to Count One, the Government argues that the evidence seized from Mr. Whyte's "primary distribution and stash location" at the time of his arrest and evidence

14

"regarding his cocaine distribution based on physical seizures during the conspiracy from coconspirators tied directly to [Mr.] Whyte." *Id.* at 4 (citing Gov. Ex. 62, Gov. Ex. 223, Gov. Ex. 224, Gov. Ex. 132, Gov. Ex. 181, Gov. Ex. 182, Gov. Ex. 244, Gov. Ex. 243, Gov. Ex. 445, Gov. Ex. 532, Gov. Ex. 20).

Fifth, according to the Government, Mr. Whyte's argument is meritless because an accounting of drugs per count was not required, as "the key for the quantities alleged for Count [O]ne was reasonable foreseeability, a quantity that could be proven by direct evidence or reasonable inferences from the facts presented." *Id.* at 6. And there was ample evidence supporting the jury's finding of the quantity of narcotics reasonably foreseeable to Mr. Whyte as a result of his participation in the conspiracy "given the direct evidence pertaining to quantities connected to [Mr.] Whyte, as well as evidence pertaining to the overall conspiracy, his role as the leader of the conspiracy, and prevalent acquisition and distribution of narcotics by the coconspirators." *Id.* at 4–6. This evidence includes intercepted communications evidencing Mr. Whyte's trips to purchase drugs, intercepted communications with Mr. Whyte's cocaine source, sworn testimony from cooperators, evidence of two controlled purchases, and evidence of narcotics obtained from the conspiracy. *Id.* (citing Gov. Ex. 69, Gov. Ex. 72, Gov. Ex. 127, Gov. Ex. 174, Gov. Ex. 180, Gov. Ex. 242, Gov. Ex. 489, Gov. Ex. 490, Gov. Ex. 491, Gov. Ex. 492, Gov. Ex. 26).

Finally, the Government argues that, contrary to the cases cited in Mr. Whyte's memorandum, the evidence in this case "showed that [Mr.] Whyte was involved in almost all the narcotics distribution, and that he worked with multiple individuals to undertake his criminal activities." *Id.* at 6 (citing *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994)).

The Court agrees.

When reviewing a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000). In sum, "[t]he government's case need not exclude every possible hypothesis of innocence," *Martinez*, 54 F.3d at 1042–43 (internal citation and quotation marks omitted), and where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter," *Guadagna*, 183 F.3d at 129 (alteration in original) (internal citation and quotation marks omitted).

At the same time, the Court is also mindful of its responsibility to protect Mr. Whyte's Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *Lorenzo*, 534 F.3d at 159).

The Court first notes that only Count One, charging a conspiracy under 21 U.S.C. § 841(b)(1), and Count Eight, charging Mr. Whyte with possession with intent to distribute and distribution under 21 U.S.C. § 841(a)(1), mentioned and required the jury to find beyond a reasonable doubt that certain quantities of narcotics were involved. Count Two and Count Three, which also charge Mr. Whyte with possession and intent to distribute and distribution under 21 U.S.C. § 841(a)(1), did not list specific quantities of narcotics and required only that the jury find beyond a reasonable doubt that Mr. Whyte possessed a mixture or substance containing a detectable amount of a controlled, substance, that he knew that he possessed a controlled substance, and that Mr. Whyte possessed these substances with the intent to distribute them.

As to Count Two and Count Three, the Government provided sufficient evidence for a jury to reasonably find that Mr. Whyte knowingly and intentionally possessed with intent to distribute and distributed a mixture and substance containing a detectable amount of heroin. Specifically, the Government showed videos and transcripts of controlled purchases of heroin, carried out by a confidential informant, on October 15, 2018, and October 30, 2018. *See* Tr. at 581–92, 633–37. The bags obtained by the confidential informant during these controlled purchases were tested by a lab and found to contain heroin. *Id.*

As to Mr. Whyte's argument that more than one conspiracy existed, "[t]he question of whether there were multiple conspiracies or a single conspiracy is one for the jury to decide." *Parrilla*, 2014 WL 7496319, at *7 (citing *United States v. Johansen,* 56 F.3d 347, 350 (2d Cir. 1995)). Moreover, "[w]here a defendant contends that multiple conspiracies were proven at trial, rather than the single conspiracy charged in the indictment, the defendant bears the burden of showing that 'no rational trier of fact could have concluded that a single conspiracy existed

based on the evidence presented.'" *United States v. Small,* No. 03 CR 1368 (ARR), 2005 WL 1263362, at *8 (E.D.N.Y. May 27, 2005) (quoting *Sureff*, 15 F.3d at 230).

On Count One, which charges Mr. Whyte with conspiracy, a jury may properly hold him liable "for the amount of narcotics that he agreed and, at one time, intended to sell." *United States v. Dallas*, 229 F.3d 105, 110–11 (2d Cir. 2000). "[C]onspiracy law maintains a conspirator's liability once a conspiracy has been formed and a defendant has joined it." *Id.*; *see also United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994) ("What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense."). The Government provided sufficient evidence for a jury to reasonably find that Mr. Whyte conspired to possess with intent to distribute and to distribute five kilograms or more of cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl. The narcotics found in Mr. Whyte's multiple apartments on February 21, 2019—approximately 175 grams of heroin; 1,300 grams of cocaine; and almost 80 grams of fentanyl just in the safe located in Unit 10—are sufficient to establish the quantities of heroin and fentanyl charged in Count One. Tr. at 865–82.

A safe in Unit 13 was also found to contain 48.9 grams of cocaine hydrochloride, 10 grams of heroin, and 11 grams of fentanyl. Tr. at 686–92. Moreover, Mr. Whyte was captured in multiple communications discussing the transportation, acquisition, and sale of drugs totaling the quantities charged in Count One. A few hours after Jackie Hernandez was stopped by authorities and a package of 1,056.1 grams of cocaine was found in the trunk of her vehicle, Mr. Whyte was captured on a wiretap mentioning that he needed a bail bondsman and that he had placed an item in the trunk of a vehicle. Tr. at 405–12.

Surveillance from the same day also saw him placing an item in the trunk of Ms. Hernandez's car. Tr. at 334–38. Mr. Orlayn Marquez also testified to having sold Mr. Whyte cocaine on two occasions, totaling around 1,100 grams, Tr. at 471, in addition to at least 40 grams of fentanyl powder on at least seven occasions, Tr. at 469–70. On February 10, 2019, Mr. General, who was shown to be Mr. Whyte's trusted associate, was seen entering and leaving a Dodge Durango and, during a police chase hours later, tossing an item out of his car that was later discovered to contain 488.6 grams of cocaine. Tr. at 343–47, 370–74.

The jury also heard evidence from Ms. Dilma Silva, a co-conspirator to whom Mr. Whyte was linked and who testified that Mr. Whyte had sent her to Panama. Tr. at 1012–29. Ms. Silva was captured attempting to smuggle two packages of cocaine, weighing 377 grams and 189 grams, back into the United States. Tr. at 1029–31. Ms. Silva's friend, Jazmine Hunter, was on the same flight, and was also carrying a package of cocaine weighing 358 grams. Tr. at 1031.

In all, the evidence showed that Mr. Whyte possessed, either actually or constructively, and distributed in excess of the quantities of cocaine, heroin, and fentanyl necessary to uphold the jury's verdict. In terms of the known quantities of heroin and fentanyl, the totals are far in excess of the necessary quantities to sustain the jury's verdict. In terms of the known quantities of cocaine, the total is nearly 5 kilograms—a total of 4917.6 grams of cocaine, based on the testimony. But this nearly 5-kilogram total of cocaine does not include the unknown quantities of cocaine from the various other trips to New York or elsewhere taken by Mr. Whyte or on his behalf. With this evidence, and the known quantities of cocaine distributed by Mr. Whyte, the jury appropriately could infer that the total quantity of cocaine fairly attributed to Mr. Whyte met or exceeded 5 kilograms, sufficient to support the jury's verdict on Count One with respect to the quantity of cocaine. *See United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) ("[W]hile

quantities of controlled substances in a drug distribution conspiracy prosecution may be determined through extrapolation, approximation, or deduction, there ordinarily must be evidence of known quantities, which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be derived."); *United States v. Adames*, 727 F. App'x 12, 13–14 (2d Cir. 2018) (concluding that if defendant was directly involved in sending nine packages, not all of which were confiscated and weighed, but it is known that the four confiscated totaled 3.936 kilograms and the Government presented sufficient evidence to infer the existence of an additional 1.06 kilograms from the unseized packages, it was proper to find defendant liable for 5 kilograms).

On Count Eight, as noted above, the items found in the safe in Unit 10 and Unit 13 both meet the quantity requirements for this charge and provide sufficient evidence for a jury to reasonably find Mr. Whyte guilty. Tr. at 686–92; 865–82.

Accordingly, Mr. Whyte's motion for acquittal as to Counts One, Two, Three and Eight will be denied.

### 2.   Count Nine

As to Count Nine, Mr. Whyte argues that there was no evidence from which the jury could have found that any of the firearms found in a safe stored in Unit 10 at 13 Washington Street were used "in furtherance of" any of the predicate drug crimes, "which is a prerequisite of the charge in [C]ount 9." Whyte Mem. for J. of Acquittal at 2, 4.

While Mr. Whyte concedes that a jury could have found that the ten firearms found in the safe belonged to him because a key to that safe was found in his possession, he argues that "not a scintilla of evidence was offered at trial that any of those firearms was used 'in furtherance of'" one of the drug trafficking activities "pertaining to [C]ounts 1 or 8, and not just drug trafficking

in general." *Id.* at 4. This is because Mr. Whyte "received no advantage from weapons locked in a safe in a different apartment from the ones ([Unit] 13 and [Unit] 14) where drug sales occurred." *Id.* at 5–6 (citing *United States v. Willis*, 5 F.4th 250, 264 (2d Cir. 2021)). He therefore had no access to these firearms to commit the predicate offenses and during the alleged drug transactions. *Id.* at 6.

He also argues that none of the witnesses testified to knowing of the presence of firearms and none of the intercepted communications refer to the firearms. *Id.* at 5. Mr. Whyte also argues that the jury's first note asked about a conversation between Mr. Whyte and Mr. General, and that the Court was constrained to not answer, which suggests that "[t]he jury assumed that such a conversation existed, even though they obviously never located it." *Id.* at 5 (citing Court Exhibit List, ECF No. 1805 (Sept. 28, 2021)).

The Government argues that this conviction should be upheld because it has proven the requisite "nexus between the charged firearm and the charged drug selling operation." Gov't Opp'n at 22 (quoting *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006); citing *United States v. Lewter*, 402 F.3d 319, 321 (2d Cir. 2005)). It points to evidence concerning Mr. Whyte's possession of a key to Unit 10; ammunition for a .22 caliber firearm found in Mr. Whyte's residence (Unit 14), which fit the .22 caliber firearm found in the safe in Unit 10; Mr. Whyte's knowledge of the prescription bottles recovered in Unit 10 (Gov. Ex. 511; Gov. Ex. 444); communications concerning the movement of the safe into Unit 10 in May 2018 (Gov. Ex. 407); drug distribution paraphernalia found in Unit 10; storage of narcotics—175 grams of heroin, almost 1,300 grams of cocaine, and almost 80 grams of fentanyl—in the safe found in Unit 10 (Gov. Ex. 110); and the identification of ten firearms, some of which were stolen and some of which were loaded, found in the safe in Unit 10. *Id.* at 23–24.

The Government also notes that Mr. Whyte dealt with large quantities of drugs, having

been known to purchase at least $44,000 worth of fentanyl pills. *Id.* at 24–25. Mr. Whyte also

had $36,567 in cash seized in a single day, and the Government seized a large money counter

from Mr. Whyte. *Id.* at 25. And Agent Carney explained that, because of the risk of robbery,

narcotics traffickers must take steps to protect themselves. *Id.* With all of this evidence, the jury

saw "evidence sufficient for them to conclude that [Mr.] Whyte not only undertook each of these

steps, but that he was ready and prepared to use the firearms to protect his drugs, some of which

were loaded, based on the firearms' close proximity to the drugs." *Id.* at 25–26 (citing *United*

*States v. McCoy*, No. 3:06CR100 (MRK), 2006 WL 3791390, *2 (D. Ct. Dec. 21, 2006); *United*

*States v. Chavez*, No. S8 02 CR 1301 (GEL), 2005 WL 774181, *1 (S.D.N.Y. Apr. 6, 2005)).

Indeed, the Government argues, the evidence goes toward the factors that a jury should consider

in determining whether a firearm was possess in furtherance of a narcotics conspiracy, including

"the type of drug activity that is being conducted, accessibility of the firearm, whether the

weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded,

proximity to drugs or drug profits, and the time and circumstances under which the gun is

found." *Id.* at 27 (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir.

2000); citing *United States v. McCloud*, 303 F. App'x 916, 919–20 (2d Cir. 2008); *Snow*, 462

F.3d 62 n.6).

In response, Mr. Whyte argues that the Government "asks the jury and the Court to

speculate that the firearms were used in connection with the drug crimes charged and ignores the

evidence or lack of evidence that" drug transactions did not take place in Unit 10, no intercepted

communications mention the firearms, there was no evidence of how long the items were in the

safe, the presence of drugs in Unit 10 do not make the firearms weapons used in furtherance of a

drug trafficking crime, Mr. Whyte's DNA was not found on any of the weapons, and the quantity of drugs or firearms is "irrelevant" to the determination of whether firearms were used in furtherance of a drug trafficking activity. Def. Anthony Whyte's Reply at 2–3.

The Court disagrees.

Mr. Whyte asks the Court and the jury to find that the firearms were used in furtherance of a drug trafficking activity only if he was seen selling drugs in Unit 10 while a firearm sat in the open, within range, and with his fingerprints or DNA on it. That is not the standard. The jury was properly charged to find Mr. Whyte guilty of this count if it found that he committed a drug trafficking crime and that he knowingly possessed a firearm in furtherance of the drug trafficking crimes from Count One and/or Count Eight. Jury Instructions at 58. The question of whether weapons were used in furtherance of a drug crime is "a very fact-intensive question requiring a careful examination of, among other things, where the gun was located and what else was found in the apartment," and is therefore a question for a jury. *United States v. Taylor*, 18 F.3d 55, 58 (2d Cir. 1994).

The Second Circuit has considered various factors when determining whether to uphold a jury's verdict on this charge, including "the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Snow*, 462 F.3d at 63, n.6. The Second Circuit has placed emphasis on whether the firearms were "in close physical proximity" to illegal narcotics and paraphernalia used to package drugs. *See id.* at 63.

Mr. Whyte clearly had access to Unit 10, and the jury was presented with evidence from which it could reasonably conclude that he controlled the safe found in that same unit, which was

the topic of conversation over various communications between Mr. Whyte, Mr. General, and Ms. Sarcia. Mr. Whyte's possession of ammunition, in his primary residence, that fit the guns in Unit 10 also provides evidence from which a jury could reasonably conclude that he had access to the firearms. That the firearms were in a locked safe does not prohibit the jury from concluding that they were used in furtherance of a drug crime, particularly considering they were found along with large quantities of drugs and drug paraphernalia.

Indeed, the jury heard evidence to support the conclusion that Mr. Whyte was involved in a sizable narcotics distribution ring, of which he was one of the main actors in New London, Connecticut. *See Chavez*, 2005 WL 774181, at *2 (upholding a jury's finding that a weapon was used in furtherance of a drug crime where the defendant was a leader in a large cocaine distribution organization, no evidence associated the defendant with other criminal activity, and no evidence associated the weapons with a legitimate purpose). Moreover, as noted in *Snow*, illegal possession of a weapon also provides the jury with evidence from which they could reasonably find Mr. Whyte guilty of Count Nine. *See also Chavez*, 2005 WL 774181, at *2 (concluding that, where the firearm was registered to someone other than the defendant, the jury "could have found that the gun was possessed in a way that was not lawful and was calculated to obscure its ownership if it was used in furtherance of a crime").

Accordingly, Mr. Whyte's motion for acquittal as to Count Nine will be denied.

### 3. Count Thirteen

Mr. Whyte also claims there was no evidence from which a jury could have found beyond a reasonable doubt that he conspired to make purchases using proceeds from illegal activity or that he conspired to conceal the nature of the proceeds of an illegal activity, which were the charges as to Count Thirteen. Whyte Mem. for J. of Acquittal at 2.

First, he argues that the money laundering claims—that Mr. Whyte conducted a financial transaction involving proceeds from narcotics trafficking under 18 U.S.C. § 1956(a)(1)(A)(i) and that he also conducted financial transactions concealing the nature of the property as unlawful under 18 U.S.C. § 1956(a)(1)(B)(i)—are inconsistent because "either [Mr.] Whyte's cash went to his rent account, or they were somehow to conceal drug activity." *Id.* at 7.

Second, Mr. Whyte argues that his funds were not "traced or 'followed' for the jury," *id.* at 7–8, and that the Government's financial expert, William Pratt, testified to following the money but did not do so to the extent necessary to provide proof of money laundering beyond a reasonable doubt. *Id.* at 7–8. In support, Mr. Whyte states that there was no analysis of his bank accounts and that, on cross-examination, Mr. Pratt "agreed that he did not follow the cash payments from [Mr.] Whyte to [Ms.] Sarcia to see if they were deposited in the landlord's rent account." *Id.* at 7.

Furthermore, if cash payments to Ms. Sarcia were attempts to conceal or launder proceeds, "there is no evidence that any of the cash paid to Amy Sarcia came from narcotics proceeds or that they were mingled with legitimate sources." *Id.* at 7–8. Payment of rent in cash, he argues, is not proof that the cash payments were to conceal illegal activity, and the fact that he regularly owed rent and [Ms.] Sarcia regularly owed him a paycheck for his promotion services—regardless of whether the value was justified—"is a red-herring issue." *Id.*

Finally, Mr. Whyte argues that the financial transactions at issue are not money laundering because the purpose of his transactions was not "to conceal the origin or nature of the proceeds." *Id.* at 9 (emphasis omitted) (citing *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008); *United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009)). "[O]rdinary commercial transactions," he claims, "do not constitute adequate proof that the spending of ill-gotten gains is

adequate to support a money-laundering conviction under 1956(a)(1)(B)(i)." *Id.* at 8 (citing *United States v. Stephenson*, 183 F.3d 110, 120–21 (2d Cir. 1999)). Mr. Whyte claims that he used funds to "purchase engagement rings and for living expenses," which were "open and obvious purposes" and "not criminalized merely because the source of the funds is from a criminal activity." *Id.* at 8.

The Government argues that it was "not required to trace or follow the money," which is "why the Court granted the Government's request for a commingling jury instruction." Gov't Opp'n at 16 (citing *United States v. Silver*, 864 F.3d 102, 114–115 (2d Cir. 2017); *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002); *United States v. Kinzler*, 55 F.3d 70, 73 (2d Cir. 1995)). As to Mr. Whyte's focus on *United States v. Stephenson*, the Government notes that the Second Circuit there upheld the defendant's conviction for money laundering under § 1956(a)(1)(B)(i); that the defendants were convicted of substantive money laundering and not money laundering conspiracy and conspiracy to violate § 1956(a)(1)(A)(i) as in this case; that Mr. Whyte and Ms. Sarcia's money laundering activities went beyond a single act as in *Stephenson*; and that unlike the actions in *Stephenson*, Mr. Whyte and Ms. Sarcia took multiple steps to conceal their actions and did so not for just for personal benefit but also for using apartments in the building for "stashing, packaging, and selling drugs." *Id.* at 17.

The Government notes that for conspiracy to money launder, the jury need only find that two or more persons entered into an agreement to commit money laundering and that the defendant knowingly entered into the agreement. *Id.* at 18 (citing *United States v. Valasquez*, 55 F. Supp. 3d 391, 397 (E.D.N.Y. 2014) (quoting *United States v. Alerre*, 430 F.3d 681, 694 (4th Cir. 2005)); *Hassan*, 578 F.3d 108). The evidence, they claim, shows in multiple ways that Ms. Sarcia and Mr. Whyte "conspired to commit laundering in order to promote and conceal the

narcotics trafficking through his rental of multiple apartments in the complex she controlled." *Id.* at 19–20.

First, the evidence shows an arrangement by which Ms. Sarcia "knew that the rent paid for these units consisted, at least in substantial part, of proceeds earned from narcotics trafficking." *Id.* at 19 (citing *United States v. Meshack*, 225 F.3d 556, 572 (5th Cir. 2000)).

Second, the evidence shows a "fictitious employment arrangement" through which Mr. Whyte "received clean income and a legitimate job on the books" and, in exchange, Ms. Sarcia "received cash-in-hand for paying [Mr.] Whyte with proceeds from the shared operational account." *Id.* at 20 (emphasis omitted) (citing Doc 1808 at 21-22; Gov. Ex. 528; Gov. Ex. 108). The Government argues that the evidence "was more than adequate for the jury to find that [Mr. Whyte's promotional services], even if they occurred, neither justified nor explained the regular, salary paychecks at the same rate as the head chef." *Id.* at 20. Specifically, the Government points to testimony from Ms. Johnson, "who actually undertook significant activities to promote events for Two Wives" and was paid in trade or per diem; the testimony of a DJ who testified to only working three events, one of which "was so unsuccessful that they cancelled the next event"; and the testimony of another restaurant owner who "explained that [Mr.] Whyte's promotional activities largely consisted of sharing events via the restaurant's website." *Id.* at 20–21.

In response, Mr. Whyte reiterates that the Government had to show "an agreement to either conceal funds from illegal sources or agree to make purchases with funds from illegal sources," and that it failed to do so through the only witness offered for that purpose—Mr. Pratt, who "admitted his failure to follow the bank accounts where the rent was intended or placed." Def. Anthony Whyte's Reply at 3.

The Court disagrees.

"Conspiring to launder money requires that two or more people agree to violate the federal money laundering statute, and that the defendant 'knowingly engaged in the conspiracy with the specific intent to commit the offenses that [are] the objects of the conspiracy.'" *Garcia*, 587 F.3d at 515 (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)). "[A] conviction for transaction money laundering . . . requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds." *Huezo*, 546 F.3d at 179. "[A] scheme that conceals only the source of the funds falls within the purview of the statute." *Kinzler*, 55 F.3d at 73.

Mr. Whyte relies heavily on *Stephenson*, which states that "the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity." *Stephenson*, 183 F.3d at 120. In that case, however, the Second Circuit emphasized that the facts did not show an "intent to conceal," because the defendant had "open[ly] and notorious[ly]" purchased a vehicle for personal benefit, without any apparent intention of concealing the source of those proceeds. *Id.* at 121. ("'Conceal' implies conduct entailing deception that goes beyond merely acting in a way that avoids compulsory disclosure."). Indeed, the Second Circuit in *Stephenson* explicitly stated that if the defendant had actually employed a "phony installment scheme," as the Government alleged, "it would have been sufficient to support the jury's finding of intent to conceal." *Id.*

The facts in this case could allow a jury to reasonably conclude that Mr. Whyte and Ms. Sarcia were attempting to employ a plan to conceal the source of Mr. Whyte's funds. While he openly and notoriously used three apartments at 13 Washington Street, Ms. Sarcia and Mr.

Whyte engaged in an employment agreement through Two Wives that was different from agreements with other employees.

Among these differences were the continuous hiring of Mr. Whyte as a promoter for services that were reportedly not successful; that Mr. Whyte was one of two salaried employees hired by Two Wives between October 2017 and September 2021, Tr. at 1349, 1451–52 (text message from Two Wives's bookkeeper to Ms. Sarcia asking "who is Mr. Whyte and is his salary really $1,000? It just seemed weird so I wanted to make sure with you first"); that Mr. Whyte was hired as a "line cook" when he was allegedly providing promotional services, Tr. at 1353–54; Ms. Sarcia personally meeting with Mr. Whyte "to do [his] paycheck," Tr. at 816–20; eyewitness observation of Ms. Sarcia providing Mr. Whyte with a paycheck and Mr. Whyte giving Ms. Sarcia cash, Tr. at 1260; and Ms. Sarcia asking Mr. Whyte which address he would like on his paycheck when she knew he lived in the building she managed. Mr. Whyte's search for someone with a job who could be seen using his funds to pay for a bondsman provides additional support for a jury's finding of an attempt to conceal. Tr. at 409–10. The jury was presented sufficient evidence from which to conclude that Mr. Whyte was attempting to create the appearance of legitimate wealth. *See Regalado Cuellar v. United States*, 553 U.S. 550, 568 (2008) ("Although this element does not require proof that the defendant attempted to create the appearance of legitimate wealth, neither can it be satisfied solely by evidence that a defendant concealed the funds during their transport.").

The Government was not required to "follow" the money. The Second Circuit, in the context of 18 U.S.C. § 1957, has stated,

> We . . . adopt the majority view of our sister Circuits—that the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957. Because money is fungible, once funds obtained from illegal

> activity are combined with funds from lawful activity in a single
> account, the "dirty" and "clean" funds cannot be distinguished
> from each other. As such, "[a] requirement that the government
> trace each dollar of the transaction to the criminal, as opposed to
> the non-criminal activity, would allow individuals effectively to
> defeat prosecution for money laundering by simply commingling
> legitimate funds with criminal proceeds."

*Silver*, 864 F.3d at 115 (quoting *United States v. Moore*, 27 F.3d 969, 976–77 (4th Cir. 1994)).

Accordingly, Mr. Whyte's motion for acquittal as to Count Thirteen will be denied.

### 4. The Second Superseding Indictment

Mr. Whyte claims that "it is undisputed that [he] was not arraigned as to the Second

Superseding Indictment before going to trial as required by Rule 10 of the Federal Rules of

Criminal Procedure nor entered a plea pursuant to Rule 11." Whyte Second Suppl. Mem. for J. of

Acquittal at 1, 3. This is because the Court allowed Defendants to file a written waiver pleading

not guilty, to avoid an appearance. "Mr. Whyte neither appeared in Court to enter his non-guilty

plea or executed the waiver offered by the Court." *Id.* at 3.

He argues that the Second Superseding Indictment made two important changes.

First, it increased his charges for fentanyl in Count One from an § 841(b)(1)(C) offense to

an § 841(b)(1)(B) offense, which carries a five-year mandatory minimum. *Id.* at 2–3. "[A]dding a

mandatory minimum sentence to the list of charges he would face," allegedly substantially

injures Mr. Whyte and "might have affected his decision to proceed to trial" had he been

properly arraigned. *Id.* at 4–5.

Second, on top of the 500 grams or more of cocaine and 100 grams or more of heroin

charged in Count Seventeen of the initial indictment and Count Ten of the Superseding

Indictment, ECF No. 426, the Second Superseding Indictment "added 40 [g]rams of [f]entanyl"

to Count Eight, Whyte Third Suppl. Mem. for J. of Acquittal at 1. "Thus, the count in the

indictment which related to the drugs found in apartment #10, with the safe, now included three different drugs, and the jury was allowed to consider the [f]entanyl allegedly found there[.]" *Id.* at 1–2. This fentanyl charge, Mr. Whyte argues, substantially injured him as well. *Id.* Therefore, he claims, a trial without an arraignment "violated his due process rights." *Id.* at 2; Whyte Second Suppl. Mem. for J. of Acquittal at 5.

In response, the Government argues that the Supreme Court in *Garland v. State of Washington*, 232 U.S. 642 (1914) found that the right to arraignment "could be affirmatively waived or implicitly waived in circumstances w[h]ere the parties proceeded as if the defendant had been duly arraigned and the defendant proceeded to trial without raising an objection." Gov't Objection to Suppl. Mems. at 7–8 (citing *Garland*, 232 U.S. at 645–46). Here, the Government argues, Mr. Whyte waived his right to object to the lack of a formal arraignment by failing to raise the objection before trial. *Id.* at 8 (citing *Garland*, 232 U.S. at 646–47; *United States v. Coffman*, 567 F.2d 960 (10th Cir. 1977)).

According to the Government, the record contains ample evidence demonstrating that Mr. Whyte was informed of the charges against him, intended to assert a not guilty plea, and did so with the assistance of counsel. *Id.* at 9.

First, they note that he was arraigned twice before his jury trial, and that at each arraignment he was represented by counsel, was informed of the charges against him, and entered a not guilty plea. *Id.* The charges from all three indictments, they note, "stem from the same conduct and are very similar," with the only substantive difference being that Count One and Count Eight include fentanyl. *Id.* at 10. Even with the addition of fentanyl to both counts, they note, "the defendant still faced the same maximum and minimum statutory penalties—five to forty years for each charge—as he did based on prior iterations of the charging document upon

which he was arraigned," of which he was previously informed during the two prior arraignments. *Id.* Thus, the alleged prejudicial effect, if any, was minimal. *Id.* at 10–11.

Counsel and Mr. Whyte were aware of the charges in the Second Superseding Indictment, which was provided to counsel via PACER. *Id.* at 9–10. The Government notes too that at the *Frye* hearing before the magistrate judge, Mr. Whyte was "informed that Count One included allegations pertaining to 40 grams or more of fentanyl, and that as a result, he faced between five and forty years of imprisonment," *id.* at 11 (citing Frye Hearing Tr. at 8, 10–11), and that he was also reminded that "he had the right to the advice of counsel, but that the decision about how to ple[a]d was his alone," *id.* at 12 (citing Frye Hearing Tr. at 17). At the conclusion of the *Frye* hearing, Mr. Whyte's counsel "stated that the defendant did not wish to accept the proposed plea agreement." *Id.* at 12 (citing Frye Hearing Tr. at 19–20). There is, they argue, "no question as to whether the defendant was afforded the opportunity to express his intention to ple[a]d not guilty and proceed to trial." *Id.*

The Government also argues that Mr. Whyte "implicitly waiv[ed] his right to a formal arraignment" and "clearly expressed his intention to ple[a]d not guilty to the charges against him" by proceeding to trial on the charges from the Second Superseding Indictment. *Id.* Specifically, he filed a Joint Trial Memorandum which set forth the charges against him, including penalty provisions for Count One and Count Eight based on 40 grams or more of fentanyl. *Id.* at 12. He also filed proposed jury instructions and received notice of the Government's proposed instructions, which included the alleged 40 grams or more of fentanyl in Count One and Count Eight. Finally, he attended the in-person pretrial conference, where the Government "identified Counts One and Eight of the Second Superseding Indictment, which

included the fentanyl provisions, as included within the counts that the Government intended to prove at trial." *Id.*

Finally, the Government notes that Mr. Whyte knew he had not been formally arraigned because, on October 25, 2019, Magistrate Judge Robert A. Richardson requested a waiver of arraignment on the Second Superseding Indictment. *Id.* at 13. Despite this notice and request, Mr. Whyte "made no attempt to even schedule an arraignment, move to dismiss, or otherwise raise the issue until after the jury was not only empaneled but returned its verdict." *Id.* at 14. According to the Government, he cannot therefore now request that the Court set aside his guilty verdict. *Id.* (citing *Rossi v. United States*, 278 F. 349, 353 (9th Cir. 1922)).

The Court agrees.

The Supreme Court made clear in *Garland* that due process "does not require the state to adopt any particular form of procedure, so long as it appears that the accused has had sufficient notice of the accusation and an adequate opportunity to defend himself in the prosecution." *Garland*, 232 U.S. at 645. Furthermore, "[a] waiver ought to be conclusively implied where the parties had proceeded as if defendant had been duly arraigned, and a formal plea of not guilty had been interposed, and where there was no objection made on account of its absence until, as in this case, the record was brought to this court for review." *Id.* at 646.

Here, for the reasons explained by the Government, Mr. Whyte clearly proceeded as if he had been duly arraigned. He was made aware of the additional fentanyl penalty on multiple occasions, and it was brought up before this Court in the Joint Trial Memorandum, the jury instructions, and at the pretrial conference. Mr. Whyte was also made aware of the charge at the *Frye* hearing, where the Government noted the 40 grams of fentanyl multiple times, and at the conclusion of which Mr. Whyte's counsel indicated that Mr. Whyte did not wish to accept the

plea agreement as to the Second Superseding Indictment. Frye Hearing Tr. at 18–19; *see also*

*Garland*, 232 U.S. at 644 ("The object of arraignment being to inform the accused of the charge

against him and obtain an answer from him was fully subserved in this case, for the accused had

taken objections to the second information, and was put to trial before a jury upon that

information in all respects as though he had entered a formal plea of not guilty."). Magistrate

Judge Richardson clearly requested a waiver of arraignment on the Second Superseding

Indictment, but Mr. Whyte did not respond. The Court is left to conclude that Mr. Whyte has

"reserved [this objection] with a view to the use which is now made of it, in an attempt to gain a

new trial for want of compliance with what in this case could have been no more than a mere

formality." *Id.* at 645.

Mr. Whyte's only response to *Garland* is that it "includes . . . somewhat bizarre language

which has not been followed for a considerable number of years," Whyte Second Suppl. Mem.

for J. of Acquittal at 4, but courts in the Second Circuit continue to cite to it for the proposition

that the lack of an arraignment does not necessarily require that a conviction be vacated, *see*

*United States v. Bouterse*, 765 F. App'x 463, 466 (2d Cir. 2019) (summary order) ("While it is

undisputed that [the defendant-appellant] was not formally arraigned prior to trial, [the

defendant-appellant] waived his right to challenge his conviction on this ground by failing to

object at any point prior to this appeal." (citing *Garland*, 232 U.S. at 646)); *United States v.*

*Thomas*, 100 F. App'x 851, 853 (2d Cir. 2004) (summary order) (concluding that the defendant-

appellant did not suffer prejudice because he was not arraigned on the second superseding

indictment (citing *Garland*, 232 U.S. at 645)); *United States v. Joyner*, 201 F.3d 61, 79 (2d Cir.

2000) (finding that failure to arraign the defendant-appellant on a "second superseding

indictment prior to the commencement of trial did not impair his right to retain a chosen jury,"

34

and noting that *Garland* held that strict adherence to the formalities of trial are not required under the Due Process Clause (citing *Garland*, 232 U.S. at 645–46)).

In *Bouterse*, the Second Circuit refused to vacate a conviction on the basis that the defendant-appellant had not been arraigned because the "failure to arraign him did not affect any substantial rights." *Bouterse*, 765 F. App'x at 466 (citing *Garland*, 232 U.S. at 645).

Accordingly, Mr. Whyte's motion for acquittal based on any alleged failure to arraign him on the charges in the Second Superseding Indictment will be denied.

## B. The Judgment of Acquittal as to Amy Sarcia

### 1. Count One

Ms. Sarcia claims that "the evidence presented at trial, even taken in a light most favorable to the [G]overnment, was such that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Sarcia Mem. for J. of Acquittal at 10. She argues that the jury must have been "overwhelm[ed] and confuse[d]" by the "unfair, spill-over [e]ffect from evidence presented against Mr. W[hyte]." *Id.* at 5.

Among the evidence that would not have been presented if Ms. Sarcia's case had been tried alone and that must have overwhelmed and confused the jury was: (1) the 10 gun boxes; (2) the "[p]ounds of cocaine, heroin, and fentanyl (for which Ms. Sarcia was not even charged)"; (3) "drugs found in other defendants' possession or control that had nothing to do with Ms. Sarcia, for which there was not even a scintilla of evidence connecting those drugs to Ms. Sarcia"; and (4) testimony of Orlayn Marquez, "an international drug dealer . . . who testified that he was involved with importing high quantities of cocaine and other drugs into the United States." *Id.* at 5–6.

As to the drugs found at 13 Washington Street, Mr. Sarcia claims "there was no evidence that [she] knew or reasonably should have known [that these drugs] existed in Mr. Whyte's world"; that she could not have inferred that Mr. Whyte's safe in Unit 10, which was "hidden from the living room in the far end of a closet," contained drugs; and that Mr. Whyte "manipulated [their] relationship for his own self-serving reasons." *Id.* at 7–10.

According to Ms. Sarcia, the Government "realized the lack of evidence directly tying in Ms. Sarcia to any of [Mr.] Whyte's drug activities" which is

> the only reasonable interpretation as to why the [G]overnment caused Stephanie Johnson, an admitted drug dealer, to be arrested 18 months later on State charges and have Agent Keith Warzecha "coincidentally" be at the New London Police Station on November 10, 2020 to interview and ultimately offer an admitted drug dealer, who is not facing a mandatory five years in prison, a sweetheart deal, if she testified against Ms. Sarcia.

*Id.* at 7 (emphasis omitted). Moreover, Ms. Johnson only stated "in very vague terms" that she had seen Ms. Sarcia use cocaine, but never mentioned any quantity amounting to 500 grams of cocaine. *Id.* at 7–8. No other witness, she points out, claims that Ms. Sarcia was linked to 500 grams of cocaine or 100 grams of heroin. *Id.* at 8. A juror allegedly could have linked Ms. Sarcia to the quantities of drugs sold by Mr. Whyte only "through sheer speculation," because "for all she knew he was selling marijuana or Xanax or some other controlled pills." *Id.* at 10 (emphasis omitted).

The Government argues that, "[g]iven the prolific nature of [Mr.] Whyte's distribution centered out of the apartment complex [Ms.] Sarcia controlled, there was extensive circumstantial evidence establishing [Ms.] Sarcia's awareness of the narcotics trafficking and her participation in allowing it to thrive in a location she controlled." Gov't Opp'n at 8. The Government also argues that it presented "ample direct evidence to show [Ms.] Sarcia's

participation in the drug conspiracy in the forms of her own words, her own text messages, communications from her coconspirators, and cooperator testimony." *Id.* This includes her using and selling cocaine, asking Ms. Whyte for a "ball," "talking about needing to see [Mr.] Whyte for drugs to provide to her third party as well as her 'boss[,]' . . . asking [Mr.] General for 'white'[,] . . . [seeking] to purchase drugs to 'motivate' her staff," and corroboration from her best friend that she used cocaine obtained from Mr. Whyte. *Id.* at 8–9. They also note that she had "equal and unfettered access to the stash apartment," at one point asking if she could go "grab" something from the apartment herself and using the stash apartment to bathe. *Id.* at 9 (citing Gov. Ex. 512). The Government claims that she also allowed Mr. Whyte "to pretend to work at her adjoining business and [to] utilize[] her business and the apartment complex to clean drug proceeds," actions which "provided a key resource to the organization—safety and legitimacy." *Id.*

The Government also argues that Ms. Sarcia's arguments concerning Ms. Johnson are erroneous and irrelevant because the witness's credibility is within the province of the jury. *Id.* (citing *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011); *Autuori*, 212 F.3d at 114; *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998); *United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir. 1983)). In any event, they argue, Ms. Johnson provided a "more than sufficient basis for a jury to accept her testimony as credible" because she was reluctant to testify against her best friend and the testimony stemmed from their relationship and shared drug use. *Id.* at 10–11.

The Government claims that Ms. Sarcia's arguments questioning her full knowledge of the conspiracy are "irrelevant as none of these facts are necessary for a conspiracy conviction," as clear from the jury instructions, which stated that "even a single act may be sufficient to draw

the defendant within the ambit of the conspiracy." *Id.* at 11 (quoting Jury Instructions at 37). The Government further notes that there is no requirement that a coconspirator commit an overt act to be guilty of a narcotics conspiracy. *Id.* (citing *United States v. Shabani*, 513 U.S. 10, 15 (1994)). Ms. Sarcia's role in the conspiracy was not just to purchase and sell cocaine but to launder the proceeds and provide protection "in the forms of a legitimate job, a place to sell drugs, and a place to store drugs." *Id.*

As to Ms. Sarcia's argument that the evidence prejudiced her, the Government notes that she did not file a motion to sever and her trial strategy focused on attempts to distinguish her conduct from Mr. Whyte's. *Id.* at 11. Moreover, she may not have even been entitled to severance simply because the evidence against Mr. Whyte was more damaging than the evidence against her or because evidence was admissible against him but not her. *Id.* at 11–12 (citing *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988); *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)). As to the guns presented at trial, the Government argues that it could have presented such evidence against her, *id.* at 12 (citing *United States v. Muniz*, 60 F.3d 65, 71 (2d Cir. 1995); *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994)), and, in any event, she did not request that the firearms be excluded nor raise this issue before the verdict, *id.* at 12–13.

The Government claims it was "not required to establish a direct association between [Ms.] Sarcia's involvement in the narcotics conspiracy and the mandatory minimum quantity of narcotics." *Id.* at 13. The Government claims it was only "required to, and did, establish that 500 grams or more of cocaine and 100 grams or more of heroin was reasonably foreseeable to [Ms.] Sarcia as a result of her participation in the conspiracy." *Id.* (emphasis omitted) (citing *United States v. Brown*, No. 04 CR 801, 2006 WL 2724025, at *6 (S.D.N.Y. Sept. 22, 2006) ("It is well-

established law that, in a narcotics conspiracy a defendant is held accountable not only for that

quantity of drugs which he, himself, conspires to distribute or possess with intent to distribute or

possess, provided he knew of his co-conspirator's illicit activities or the activities were

reasonabl[y] foreseeable by him." (internal citation and quotation marks omitted))). The

evidence, primarily that Mr. Whyte's distribution was based at the apartment complex she

controlled, "was ample evidence for the jury to conclude that this quantity and type of narcotics

was reasonably foreseeable to [Ms.] Sarcia" given her "sustained involvement in the

conspiracy," her "use, purchase, and distribution of cocaine" and her "access to [Mr.] Whyte's

stash of narcotics, which included both cocaine and heroin." *Id.* at 13–15 (emphasis omitted)

(citing *United States v. Littrell*, 574 F.2d 828, 835 (5th Cir. 1978); *United States v. Agundiz-*

*Montes*, 679 F. App'x 380, 385 (6th Cir. 2017); *People v. Ortiz*, 877 N.Y.S. 2d 175 (App. Div.

2009)).

     In response, Ms. Sarcia argues that "[e]vidence that [she] had access to the apartment, not

the safe itself, and knowledge that [Mr.] Whyte had transported a large safe, is insufficient to

support the quantity of drugs Ms. Sarcia was convicted of possessing with intent to distribute."

Def. Amy Sarcia's Reply at 2. This is because the Government did not show that Ms. Sarcia

knew the safe was in Unit 10 or that she could access or did access the safe. Moreover, her DNA

was not found on any of the items in the safe, none of her belongings were in the closet where

the safe was located in Unit 10, and the previous tenant testified it was possible to walk through

the apartment without seeing the safe in the closet. *Id.* She also argues that there is no evidence

that at any time "she could have exercised dominion and control over the drugs," as required by

the case law, *id.* at 3 (citing *United States v. Campbell*, 210 F.3d 356 (2d Cir. 2000); *United*

*States v. Rivera*, 844 F.2d 916, 925 (2d Cir. 1988)), and that the Government failed to prove the

drug quantity beyond a reasonable doubt, *id.* (citing *United States v. Gonzalez*, 420 F.3d 111, 125 (2d Cir. 2005)).

Ms. Sarcia argues that the evidence is insufficient to support the Government's argument that she "knew of the prolific narcotics ring that [Mr.] Whyte was operating from the apartment building," because it is unreasonable to expect her to have "vehemently monitored" the parking lot where Mr. Whyte drove or sold narcotics and because he engaged in transactions within the privacy of his apartment. *Id.* at 5. It is also unreasonable, she argues, to find that she knowingly and willfully acted as a participant in the unlawful plan when the Government only established a "mere buyer-seller relationship" and a cooperator's testimony that Ms. Sarcia sold cocaine, and none of the communications showed "one such transaction." *Id*. at 6.

The Court disagrees, but while there may be sufficient evidence to convict Ms. Sarcia of participating in a drug conspiracy generally as a lesser included offense, there is not sufficient evidence for a conviction on an aggravated offense based on specific quantities of cocaine and heroin.

The Court first notes that Ms. Sarcia did not request a severance and did not object to the presentation of the evidence that she claims was prejudicial. Moreover, "a disproportionate introduction of evidence relating to joined defendants does not require a severance in every case." *Cardascia*, 951 F.2d at 483. The Court also provided jury instructions as to each defendant, delineating the different charges against both Mr. Whyte and Ms. Sarcia, and gave the parties the opportunity to review and raise any issues with them before submission to the jury. *See* Proposed Annotated Post-Trial Jury Instructions, ECF No. 1749 (Sept. 12, 2021); Min. Entry, ECF No. 1778 (Sept. 24, 2021) (minute entries for jury trial and charge conference); Jury Instructions, ECF No. 1776 (Sept. 26, 2021) (the order posting the jury instructions notes that

"[f]ollowing the September 24, 2021 charge conference, and the additional submissions of the parties, the Court has finalized the post-trial jury instructions and verdict form."). Given the large quantity of narcotics attributed to Mr. Whyte and other co-conspirators, and the significantly smaller amount allegedly attributed to Ms. Sarcia, there is nothing in this record to suggest that the jury confused the evidence.

As noted in the Court's instructions to the jury, to prove the conspiracy charge, the Government needed to prove, beyond a reasonable doubt, that two or more persons entered into an unlawful agreement to possess with intent to distribute the applicable narcotics, and that the Defendants knowingly and willfully became members of the conspiracy and shared a unity of purpose to achieve the conspiracy's objective. Jury Instructions at 34. The Government must present "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) (quoting *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)). "Proof that the defendant knew that *some* crime would be committed is not enough." *Id.* (quoting *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002)).

The Government presented evidence from which a reasonable jury could conclude that Ms. Sarcia was aware of the narcotics selling scheme of which she was charged. First, a jury could reasonably conclude that Ms. Sarcia, on more than one occasion, not only purchased cocaine for herself, but also facilitated the sale of narcotics to others. *See* Gov. Ex. 169 (Ms. Sarcia requesting "a little something" to "motivate [her] staff"); Gov. Ex. 482 (Ms. Sarcia stating that she "need[s] green and white for the party"); Gov. Ex. 483 (Ms. Sarcia speaking about "getting some white"); Gov. Ex. 512 (text message from Ms. Sarcia asking if she could go

"grab" something from the stash apartment); Gov. Ex. 513 (text message from Ms. Sarcia indicating that she was "trying to get something for [her] boss"); Gov. Ex. 527 (asking Mr. Whyte for a "ball"); Tr. 1262–73; *see also Brown*, 2006 WL 2724025, at *2 ("A conviction may also be based on solely circumstantial evidence, including circumstantial evidence going to the existence of and a defendant's participation in a conspiracy." (citing *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992))).

A jury also could reasonably conclude that Ms. Sarcia knew that Mr. Whyte maintained multiple apartments at 13 Washington Street; that she went "in and out of the apartment" that she shared with him, which contained the safe with firearms and narcotics; and that Mr. Whyte and Ms. Sarcia had a close relationship and spent time together in Unit 10. Tr. at 812–26 (discussing evidence showing that Ms. Sarcia was aware of Mr. Whyte's use of various apartments at 13 Washington Street and text messages indicating that she went "in and out" of, bathed in, and met with Mr. Whyte in the apartment they shared). Ms. Sarcia, in May 2018, also helped Mr. Whyte find a way to transport a "big safe" that a jury could reasonably conclude was the safe containing firearms and narcotics in Unit 10, which Ms. Sarcia shared with Mr. Whyte. Tr. at 827–29.

This is not a case where the Government only presented "[p]roof that the defendant engaged in suspicious behavior, without proof that [s]he had knowledge that h[er] conduct involved narcotics." *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010). As in *Parrilla*, Ms. Sarcia "knew the conspiracy involved [narcotics] distribution and . . . knew the identities of the other members of the conspiracy. There was also a cooperating witness who testified at trial regarding [the defendant's] involvement in the conspiracy[.]" *Parrilla*, 2014 WL 7496319, at *9; *cf.*, Tr. at 1272–73 (Ms. Johnson stating that she saw Ms. Sarcia obtain cocaine from Mr. General). As to Ms. Sarcia's arguments about Ms. Johnson's credibility, determinations with

respect to her credibility were within the province of the jury. *See United States v. Tocco*, 135 F.3d 116, 123 (2d Cir. 1998) (stating that courts must "defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences").

Nevertheless, while there may be sufficient evidence that Ms. Sarcia participated in a criminal drug conspiracy generally, there is insufficient evidence to uphold the jury's verdict as to an aggravated offense with respect to the specific quantities of cocaine and heroin allegedly attributed to her.

As noted above, with respect to the specific quantities attributed to Mr. Whyte, this Court must be mindful of its responsibility to protect Ms. Sarcia's Fifth Amendment rights. *See Valle*, 807 F.3d at 513. If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *Clark*, 740 F.3d at 811).

In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *Lorenzo*, 534 F.3d at 159).

"[D]rug quantity is an element that must always be pleaded and proved to a jury or admitted by a defendant to support conviction or sentence on an aggravated offense under Section 841(b)(1)(A) or (b)(1)(B)." *Gonzalez*, 420 F.3d at 131. "The drug quantity attributable to

a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly; (2) transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him; and (3) quantities he agreed to distribute or possess with intent to distribute 'regardless of whether he ultimately committed the substantive act.'" *Pauling*, 924 F.3d at 657 (quoting *Jackson*, 335 F.3d at 181).

And "[t]o prove the quantity by one of these means beyond a reasonable doubt, the government must introduce specific evidence of drug quantities, or evidence from which quantity can, through inference, be logically approximated or extrapolated." *Id.* "Thus, while quantities of controlled substances in a drug distribution conspiracy prosecution may be determined through extrapolation, approximation, or deduction, there ordinarily must be evidence of known quantities, which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be inferred." *Id.*

With respect to Ms. Sarcia, in sharp contrast to the evidence at trial presented with respect to Mr. Whyte regarding specific quantities of drugs and drug type, as discussed above, there was no testimony by any witness associating Ms. Sarcia with a quantity of cocaine even remotely approximating 500 grams of cocaine, and no evidence at all regarding any distribution or even possession of any quantity of heroin by her.

Throughout this investigation and subsequent prosecution, there was no evidence connecting Ms. Sarcia to any drug quantities through any undercover efforts, including conversations captured on wiretaps. *See, e.g.*, Tr. at 655–56 ("Q: And during this period of time, to your knowledge – to your knowledge, did anyone send anyone to visit with Ms. Sarcia, an undercover officer, in order to do a drug deal? A: No, sir. Q: Do you know whether or not anyone during your time, because it's all you can speak of, sent a confidential informant to visit

44

with Ms. Sarcia in order to buy or sell drugs? A: Not that I'm aware of." ) (testimony of Officer

Marco Zandri, New London Police Department, assigned to the Statewide Narcotics Task Force,

and with the Drug Enforcement Agency Task Force); *id.* at 658-659 ("Q: And on the phone calls

that were between these individuals, you didn't hear Ms. Sarcia maybe in the background or

anything? A: In the specific phone calls for the controlled purchases, no, I did not.") (same

witness).

      When they searched Ms. Sarcia's residence, there was no evidence of any quantity of

cocaine or heroin found there:

> Q: And could you tell the jury how much cocaine they found in the
> house?
> A: None.
> Q: None.
> A: No.
> Q: Would you tell the jury how much heroin they found in the
> house?
> A: None.

Tr. at 735 (testimony of Officer Kerry Browning of the Stonington Police Department with the

Statewide Narcotics Task Force); *see also* Tr. at 746 (testifying that no illegal drugs were found

in her home as well as no "bulk currency") (testimony of Detective Matthew Kowalczyk of the

Bristol Police Department, with the DEA Task Force).

      Nor was there any quantity of either cocaine or heroin found in Ms. Sarcia's office at the

Two Wives Restaurant. Tr. at 1179–80 ("Q: . . . . When you went through the safe, did you find

any heroin in that office? A: No, sir. Q: . . . So, when you went through that office, you didn't

find any heroin, correct? A: Correct. Q: And you didn't find any cocaine, is that correct? A: That

is correct.").

      On the drugs seized by the Government as evidence in this case, there is nothing to

suggest that Ms. Sarcia touched, much less possessed or distributed, any of this evidence. *See* Tr.

at 965–66 ("Q: Okay. So without going through belaboring the points that both counsel have

made, is it fair to state that sitting there as an expert you cannot state that my client's DNA was

on any of the products you examined? A: His DNA profile was not detected – or her DNA

profile, sorry, was not detected on any of the samples tested for DNA.") (testimony of Steven

Bryant of Connecticut State Forensic Laboratory).

In fact, the case agent, Keith Warzecha testified that there was no evidence of any actual

sales of either cocaine or heroin by Ms. Sarcia. *See* Tr. At 1173:22–1174:6 ("Q: Okay. Now, in

the case of Ms. Sarcia . . . do you have any hand-to-hand sales involving Ms. Sarcia of cocaine:

A: No. Q: Do you have any hand-to-hand sales involving Ms. Sarcia of heroin? A: No.").

Stephanie Johnson, a former friend of Ms. Sarcia, did testify about use and distribution of

cocaine—not heroin—but in quantities of "a few grams here and there," Tr. at 1221–22, and

again nothing even approximating 500 grams. Ms. Johnson also testified about the usage, but not

the distribution, of cocaine in the Two Wives restaurant. *See* Tr. at 1258 ("[A]my and I have

done cocaine together in the restaurant.").

Significantly, in their closing argument, the Government did not specify the specific

quantifies of either cocaine or heroin fairly attributable to Ms. Sarcia as part of the underlying

drug conspiracy in Count One. The Government generally noted that: "In terms of the quantity of

cocaine, we have 5 kilograms for Mr. Whyte and 500 grams for Ms. Sarcia. This isn't directly in

your hands. It can be, but it's also what was reasonably foreseeable." Tr. at 1955.

The Government then discussed "trips to New York," Tr. at 1955–56, in regard to which

no one testified about Ms. Sarcia's involvement; then "the continuing relationship [between] Mr.

Whyte and Mr. Gordon, his source of supply," *id.* at 1956, where again no one testified about

Ms. Sarcia's involvement; and finally "evidence of heroin . . . as well as the controlled buys," *id.*,

but here as well no one testified about Ms. Sarcia with any quantity of heroin and there were no "controlled buys" involving her.

Perhaps, given the absence of evidence as to quantity with respect to Ms. Sarcia, the Government argues that any quantity of drugs contained in the safe in Unit 10 appropriately attributed to Mr. Whyte also should be attributed to Ms. Sarcia. *See* Tr. at 1957 ("We heard a lot of evidence in terms of [Mr. Whyte's] possession to these apartments as well as his discussion of needing to move a big safe in. And who did he share those discussions with? They were between Ms. Sarcia and Mr. Whyte and Mr. General."). Ms. Sarcia may have had access to the apartment where the safe was kept. There was no testimony, however, that she had knowledge of the safe's contents, or could even get inside the safe. To the contrary, the Government argued that Mr. Whyte provided access into the safe, not Ms. Sarcia. *Id.* ("We also heard evidence about a call where [Mr. Whyte] tells General how to access a safe by turning it to 23. The only two [safes] that are turn dial safes are the one inside his residence, unit 14, and the one up in unit 10. [Mr. Whyte] told law enforcement that to open the one in his apartment, you turned to 40.").

Consistent with the prevailing case law, this Court cannot adopt the notion that Ms. Sarcia constructively possessed the quantities of cocaine and heroin contained in the safe. *See, e.g.*, *United States v. Martinez*, 133 F. App'x 762, 764–66 (2d Cir. 2005) (finding that 150 kilograms of cocaine could not be attributed to the defendant on the basis that he had helped create nine hidden traps in three cars, which could hold 150 kilograms of cocaine); *United States v. Soto*, 716 F.2d 989, 991–92 (2d Cir. 1983) ("As defendant correctly observes, and as the government necessarily concedes, [the defendant's] mere presence at the apartment, even coupled with the knowledge that a crime was being committed there, is not sufficient to establish her guilt. . . . Absent some showing of purposeful behavior tending to connect defendant with the

acquisition, concealment, importation, use or sale of drugs or firearms, participation in the conspiracies cannot be proven by presence alone."). Indeed, by indicting and therefore considering Mr. Whyte and Ms. Sarcia responsible for far different quantities, *compare* Second Superseding Indictment at 3–4, (charging Mr. Whyte with five kilograms or more of cocaine) *with* Second Superseding Indictment at 3–4 (charging Ms. Sarcia with 500 grams or more of cocaine), the Government effectively concedes that the quantity of cocaine in the safe in Unit 10 could not plausibly be attributed to her, even under the lesser probable cause standard.

Instead, as the Government itself argued, the possession and distribution of specific quantities of either cocaine or heroin were not Ms. Sarcia's role in this drug conspiracy. Her role was "to be that clean face, to provide the safe place to deal drugs. . . . It's not to be out there dealing high levels of drugs or going to New York to obtain the cocaine. Her role is to be providing the location and the front for the money." Tr. at 2042–43.

Given that role, one consistent with the evidence presented at trial, and the law, which requires that specific quantities of cocaine and heroin "attributable to a defendant knowingly participating in a drug distribution conspiracy include[] (1) transactions in which [s]he participated directly; (2) transactions in which [s]he did not personally participate, but where [s]he knew of the transactions or they were reasonably foreseeable to h[er]; and (3) quantities [s]he agreed to distribute or possess with intent to distribute regardless of whether [s]he ultimately committed the substantive act," *Pauling*, 924 F.3d at 657 (internal citations and quotation marks omitted), Ms. Sarcia's motion for acquittal for an aggravated offense under Count One must be granted.

As detailed above, however, the evidence at trial supported a conviction on the lesser included offense of distributing cocaine and heroin of any quantity in violation of 21 U.S.C. §§

841(a)(1) and 841(b)(1)(C). And if the jury was so instructed and distinguished between the lesser included offense and the aggravated offense, "Rules 29 and 31(c) [of the Federal Rules of Criminal Procedure] permit the Court to enter a judgment of conviction on a lesser-included offense when it finds that an element exclusive to the greater offense is not supported by evidence sufficient to sustain the jury's finding of guilt on the greater offense." *United States v. Pauling*, 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017) (internal citations and quotation marks omitted), *aff'd*, 924 F.3d 649 (2d Cir. 2019).

Here, the jury was so instructed:

> In order to sustain its burden of proof for the crime charged in Count One, the government must prove the following essential elements beyond a reasonable doubt: First[,] [t]hat the conspiracy existed, that is to say, two or more persons entered into an unlawful agreement to possess with intent to distribute, and to distribute, heroin, cocaine, and/or fentanyl.

> Second, that the defendants knowingly and willfully became members of the conspiracy and shared a unity of purpose to achieve the conspiracy's objective.

> If you find that the government has proven the first and second elements beyond a reasonable doubt, then you will be asked to consider a third question, whether the defendants knew and reasonably should have foreseen that the conspiracy involved the mixtures and substances containing the amounts of cocaine, heroin, and/or fentanyl charged in Count One.

Tr. at 1869–70.[4]

---

[4]This jury instruction was consistent with discussions at the charge conference:

> Ms. Freismuth: The important part we wanted them to understand is that the third, what you are referring to as the third element, is not necessary for the conspiracy conviction itself. The third element pertains to the quantity. It is separate. We want that to be clear to the jury. But it is –[.]
> The Court: Understood.
> Ms. Freismuth: It is two elements we need for the conviction.
> The Court: Defense?
> Mr. Einhorn: I think it's accurate, Your Honor.
> The Court: All right. So I will keep the language.

The verdict form also required the jurors to separately answer whether Ms. Sarcia had

been found guilty of the underlying conspiracy, before inquiring into whether there were specific

quantities of cocaine and heroin that could be attributed to her:

> 5. As to the charge in Count One of conspiracy to possess with intent to distribute and to distribute cocaine and/or heroin, we the Jury unanimously find the defendant AMY SARCIA:
>
> Not Guilty ____                                       Guilty ____.
>
> If you answered Not Guilty to Question 5, proceed to Question 8.
> If you answered Guilty to Question 5, proceed to Question 6.
>
> 6. As to Count One, we the Jury unanimously find [] the following quantity of cocaine reasonably foreseeable to the defendant AMY SARCIA:
>
> a) 500 grams or more ____
>
> b) less than 500 grams ____
>
> Please proceed to Question 7.
>
> 7. As to Count One, we the Jury unanimously find [] the following quantity of heroin reasonably foreseeable to the defendant AMY SARCIA:
>
> a) 100 grams or more ____
>
> b) less than 100 grams ____
>
> Please proceed to Question 8.

Jury Verdict at 2. And the jury answered those questions separately, finding Ms. Sarcia guilty of

a Count One conspiracy, and then separately attributing to her quantities of cocaine of 500 grams

or more, and of heroin of 100 grams or more.[5]

---

Tr. at 38–40.

[5] In *Pauling*, on the conspiracy to distribute and possess with intent to distribute count for which the district court granted the Rule 29 motion and which the Second Circuit affirmed, the jury was similarly asked to first determine

Accordingly, while the motion for acquittal will be granted as to Count One and its aggravated offenses, the Court will enter a judgment of conviction against Ms. Sarcia on the lesser included charge in Count One without any specific quantities of cocaine and heroin being attributed to her.

Under Rule 29(d) of the Federal Rules of Criminal Procedure, "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." For substantially the same reasons that the motion for acquittal is granted, the Court conditionally grants the motion for a new trial, having "weigh[ed] the evidence objectively." *Pauling*, 256 F. Supp. 3d at 340 ("Unlike Rule 29, however, under which the Court viewed the evidence in the light most favorable to the prosecution, Rule 33 permits the Court to weigh the evidence objectively."); *see also United States v. Espaillet*, 380 F.3d 713, 720 (2d Cir. 2004) (reviewing a district court's denial of a new trial motion under Rule 29(d) and noting both that the court may grant a new trial if the interest of justice so requires and that "[i]n exercising its discretion, the district court may weigh the evidence and credibility of witnesses . . . but may not wholly usurp the jury's role" (citing *Autuori*, 212 F.3d at 120; *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992))).

As discussed above, there is insufficient evidence in this record to support a conviction for a conspiracy to possess and distribute a quantity of 500 grams of cocaine or 100 grams of heroin against Ms. Sarcia.

Accordingly, just as the District Court found in *Pauling*, "the weight of the evidence cuts against the jury's verdict with respect to Count One . . . . [and] if the Court of Appeals vacates or

---

the defendant's guilt as to the conspiracy before being asked about the quantity attributable to the defendant. *See* Verdict Sheet at 1, ECF No. 37, *United States v. Pauling*, 256 F. Supp. 3d 329 (No. 16-CR-563 (JPO)).

reverses the Court's Rule 29 ruling, then [Ms. Sarcia] would be entitled to a new trial on Count One." *Pauling*, 256 F. Supp. 3d at 341.

### 2. Count Thirteen

As to Count Thirteen, Ms. Sarcia argues that a reasonable mind could not have concluded that she was guilty of the money laundering charge, for several reasons.

First, she claims that it would not make sense for Mr. Whyte to launder, through Ms. Sarcia, only $500 a week from November 2017 until February 2019, for a total of around $28,000, when Mr. Whyte allegedly spent "thousands upon thousands of dollars . . . bringing drugs into Connecticut." Sarcia Mem. for J. of Acquittal at 11.

Second, she argues that it is not reasonably logical that she engaged in transferring drug money into legitimate cash and "took money out of her own pocket to pay state and federal taxes according to . . . government witness . . . Kathleen Haggen," because there is no clear motive for Ms. Sarcia, a person with no criminal history, to commit this crime and risk disgrace and incarceration. *Id.* The Government, she argues "recognizes their problems with their theory of the case, causing them to speculate with such motives as drugs or sex or whatever." *Id.* According to Ms. Sarcia, there is insufficient proof to make the risk worthwhile and provide motive. *Id.* at 12. Moreover, there was evidence showing that Mr. Whyte promoted Two Wives's business, which he did not do for free. *Id.* Even if Ms. Sarcia were overpaying Mr. Whyte, she argues, such evidence would not be proof of illicit activity. *Id.*

Additionally, Ms. Sarcia argues that the Government's argument is premised on speculation. First, she notes the lack of "any ledge[r] documents to keep track of the sums of cash being passed to Ms. Sarcia." *Id.* at 13. According to Ms. Sarcia, the Government merely speculates that she met with Mr. Whyte in her office, on the roughly 17 times she texted him

over one year, so that he could provide her the $500 of cash to launder. *Id.* at 13. It is "just as possible, if not more so," she argues, that they were meeting to discuss what he was doing to promote Two Wives. *Id.* And if Ms. Sarcia already had these funds, she would not have needed to chase Mr. Whyte for rent money. *Id.*

The Government's arguments in opposition are summarized in the section discussing its opposition to Mr. Whyte's arguments for acquittal on Count Thirteen. *See supra* Section III.A.3.

In response, Ms. Sarcia argues that the Government's claim that she knew the money Mr. Whyte paid was the product of illegal narcotics trafficking is "entirely unfounded" because she had no reason to suspect that the rent money was tainted since his $1,700 a month salary from Two Wives was sufficient to pay his $975 monthly rent for his residence. Def. Amy Sarcia's Reply at 7 (citing *United States v. Murray*, 154 F. App'x 740, 744 (11th Cir. 2005)). Unit 13, she argues, was occupied by Glenn Parker, whose pill bottles were found in the unit. *Id.* And she allegedly did not have reason to believe Mr. Whyte was "flowing in cash" because the evidence shows she had to chase Mr. Whyte for rent money and, on one occasion, payment for a meal he had at Two Wives. *Id.* at 8.

The Court disagrees.

Again, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found that Ms. Sarcia conducted a financial transaction involving property constituting the proceeds of unlawful activity, that she knew the property involved in that transaction was the proceeds of an unlawful activity, and that she acted with the intent to promote the carrying on of that unlawful activity. *See Jackson*, 443 U.S. at 319 (finding that the judgment of acquittal threshold is "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

The Government presented evidence from which a jury could conclude that Ms. Sarcia knew that Mr. Whyte dealt drugs and therefore was familiar with the origin of his funds. *See supra* Section III.B.1. Moreover, the Government provided evidence of repeated exchanges between Mr. Whyte and Ms. Sarcia indicating that he gave her cash for her to "do the payroll." Tr. at 1260, 1451–56 (text message from Ms. Sarcia indicating that Mr. Whyte was paid $500 per week and text messages from Mr. Whyte to Ms. Sarcia indicating that he either had $500 or the "weekly" for her). The evidence suggested to the jury that all of these exchanges took place at 13 Washington Street. For these reasons, and those discussed in Section III.A.3, Ms. Sarcia's actions "are more consistent with those of a knowing participant whose role in the conspiracy was well-planned than those of an unwitting outsider who was simply performing h[er] regular job." *Huezo*, 546 F.3d at 183–84.

Ms. Sarcia argues both that the amount of money allegedly laundered is too small for the concealment scheme to be worthwhile, and that any alleged discrepancy between the amount of money paid to Mr. Whyte for his promotional services and the success of those promotional services is not proof of illicit activity. In other words, Ms. Sarcia suggests that the jury should have focused on amounts on the one hand but not on the other. The Court disagrees with both suggestions.

First, the charge does not include an element requiring that the money laundering scheme or conspiracy provide laundering services for all illicit funds. And the jury reasonably could have concluded that Mr. Whyte's main concern was to spend funds through someone employed. *See, e.g.*, Tr. at 409–10 ("I got the bread for the bond. I just need somebody. I don't know if one of

her brothers, somebody, but it needs to be somebody with a job, like two people with a job."). Whether the alleged arrangement between Mr. Whyte and Ms. Sarcia was logical was a question for the jury, and they were provided evidence sufficient to reasonably conclude that Mr. Sarcia was content with the arrangement, not least of all the many text messages showing that she continued to receive cash from Mr. Whyte and that he continued to receive paychecks from Two Wives.

      Accordingly, Ms. Sarcia's motion for acquittal on Count Thirteen will be denied.

## IV.    CONCLUSION

      For the reasons explained above, the Court **DENIES** Mr. Whyte's motion for judgement of acquittal.

      As to Ms. Sarcia, the Court **GRANTS** in part and **DENIES** in part Ms. Sarcia's motion for judgment of acquittal.

      The motion for acquittal is **GRANTED** as to **COUNT ONE**, but **DENIED** as to Count Thirteen.

      Consistent with Rule 29 and 31(c) of the Federal Rules of Criminal Procedure, however, the Court will enter a judgment of conviction as to Ms. Sarcia on the lesser included offense of a conspiracy without any specific quantity of cocaine or heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Also consistent with Rule 29(d), the Court conditionally grants Ms. Sarcia a new trial on Count One, in the event the Second Circuit Court of Appeals vacates or reverses this Rule 29 ruling.

      **SO ORDERED** at Bridgeport, Connecticut this 9th day of September, 2022.

                    /s/ Victor A. Bolden
                    VICTOR A. BOLDEN
                    UNITED STATES DISTRICT JUDGE